HERBERT C. BEYER ET AL. *v.* MAYOR AND CITY
COUNCIL OF BALTIMORE

[No. 48, October Term, 1943.]

*Decided December 15, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, MELVIN, ADAMS, and BAILEY, JJ.

*Samuel S. Elsenberg* and *Meyer Reamer* for the appellants.

*Henry L. D. Standford, Jr., Assistant City Solicitor,* and *Avrum K. Rifman,* with whom was *Simon E. Sobeloff, City Solicitor,* on the brief, for the Mayor *and City* Council of Baltimore.

*Michael F. DeLea* for Solomon Gudis.

MARBURY, J., delivered the opinion of the Court.

Solomon Gudis made application on September 25, 1942, to the Building Engineer of the City of Baltimore for a permit to use the premises 1 to 15 West Wheeling Street for the purpose of storing, buying and selling rags, paper, iron and metal, or in common par-

lance, for the purpose of there conducting a junk business. His application was the same day disapproved under Paragraph 6 of the zoning ordinance of Baltimore City, which is Ordinance 1247, with amendments. The reason for such disapproval was that the property was located in a second commercial use district as provided by Paragraph 4 of the ordinance and that in such district no land or building can be used for a junk shop. Gudis appealed to the Board of Zoning Appeals, where there was a hearing on October 6, 1942. The board granted him a permit after hearing certain protestants. That conclusion was reached because, in the opinion of the board, there was a non-conforming use attached to the premises under Paragraph 11 of the ordinance, which had not been lost by the owner. The appellants here, who were taxpayers of the City of Baltimore, filed a petition and appeal from the action of the Board of Zoning Appeals in the Baltimore City Court. This was answered by the Mayor and City Council of Baltimore, upholding the action of its Board of Zoning Appeals. Solomon Gudis, on his petition, was also made a party defendant. After testimony was taken in the Baltimore City Court, an order was passed affirming the decision of the Board of Zoning Appeals and from this order the appeal to this court was taken.

Non-conforming uses have been before this court in several cases. They are common to all zoning statutes or ordinances and are those permitted by such statutes or ordinances to continue even though similar uses are not permitted in the area in which they are located. The reason for this is stated in a leading work on the subject: "The view that has been followed is that a few non-conforming buildings and uses if allowed to continue will not be a substantial injury to a community if only such non-conforming buildings are not allowed to multiply where they are harmful or improper. Zoning has sought to safeguard the future, in the expectation that time will repair the mistakes of the past." *Bassett on Zoning*, Chap. V, p. 105. The provision in the Bal-

timore City ordinance is contained in Paragraph 11, which reads as follows: "Non-conforming Uses. A non-conforming use is a use that now exists and that does not comply with the regulations for the use district in which it is established. A non-conforming use may not be extended, except as hereinafter provided, but the extension of a use to any portion of a building, which portion is now arranged or designed for such non-conforming use, shall not be deemed to be an extension of a non-conforming use. A non-conforming use may be changed to a use of the same classification or to a use of a higher classification. A non-conforming use, if changed to a use of a higher classification, may not thereafter be changed to a use of a lower classification. If a use, for which an ordinance is required under the provisions of Paragraph 4, is changed to a use for which no ordinance is required under those provisions, it may not thereafter be changed to a use for which an ordinance is required without such an ordinance. Nothing contained in this ordinance shall be construed to prevent the continuance of any use which now legally exists."

The non-conforming use claimed to have attached to the premises was that of operating a slaughter house. It appears undisputed that such an operation was started there in 1810 and was continued until 1938. This was entirely in the control of one family, the Kriels, and at the time of the hearing before the Board of Zoning Appeals, Mr. Andrew G. Kriel, president of the C. G. Kriel Company, owner of the property, so testified. Gudis in his testimony stated that he was owner of the property, and his counsel added "under a contract." This point is not further elaborated, but we assume Mr. Gudis is buying the property from the Kriel Company under a contract of sale.

Two points are made with respect to the non-conforming use of the property. One is that it has been lost by change to a use of higher classification. The other is that it has been abandoned. The conduct of a slaugh-

ter house is forbidden in a second commercial use district so that in this respect such use, and use as a junk shop, belong to the same classification. If, therefore, after the slaughter house was discontinued in 1938, the use was not changed to a higher classification, or was not abandoned, the property could be legally used as a junk shop. On the other hand if the use has been changed to a higher classification, or if it has been abandoned, then there is no longer a non-conforming use there, and the use of the property as a junk shop is forbidden.

Mr. Kriel, as stated above, testified before the Zoning Board Appeals, but did not appear before the court. The reason for this does not appear. In his testimony before the board he was asked whether, when in 1938 he ceased the killing of cattle and animals on the premises, was it his intention, or was it his intention at the time of the hearing, to abandon the use established there for 128 years. He replied: "Absolutely not." He was then asked whether he had used the property for other purposes since 1938, and he said it had been used for various purposes. Then the following question and answer are found in the record: "Q. But you never intended to abandon the use of the premises? A. We were probably waiting for more favorable opportunities to go back into it."

The slaughter house property used by the Kriels consisted of some buildings on Henrietta Street, which ran all the way through to the north side of Wheeling Street. An overhead bridge ran from one of them to the property in question on the south side of Wheeling Street. The entire property was used as a slaughter house, and this was the only location the Kriels had in Baltimore City for that purpose. A protesting witness before the Board of Zoning Appeals stated that all the machinery and all equipment had been moved out, and the entire stock and equipment sold, and the buildings rented for other purposes. That particular witness bought piping and iron from the machinery in the boiler

room. In answer to this general statement, Mr. Kriel testified that it had been used since 1938 as a storage warehouse until such time as he wanted to go back into the slaughtering business, which he intended to resume when a more favorable opportunity presented itself. He said the statement that the premises were dismantled was incorrect. That the obsolete machinery was disposed of and the modern machinery is still in the plant, though he did not enlarge on this or testify how much modern machinery was still there. He, however, denied that in temporarily closing down, and in getting rid of the machinery that he did dispose of, he intended to abandon the premises for use as a slaughter house, and said that his intention was to rent it out temporarily until such time as it would be more suitable to continue the business.

The testimony of other witnesses before the court, however, puts a different light on the picture. One of these, whose property is across an eight-foot alley from the building, says that after the Kriels ceased operation in 1938, the first floor of the building was used as a garage and storage place for furniture, and that he had been in there to look at it and that he had seen all kinds of furniture, refrigerators and various other things such as a furniture company would store, and large tractor trailers were bringing furniture every few days from factories in North Carolina. He himself had stored some cans in the Henrietta Street building and when he went up there he did not see any machinery on the first, third or fourth floors, all that he saw was furniture piled up. Another witness, one end of whose property runs into Wheeling Street, said that he saw wreckers come to the Kriel property, take down a smokestack, get out the boilers; saw trucks taking away the hooks and rails that animals are swung on after being killed, and saw other machinery being taken out. He said the smokestack was about 150 feet above the building and that it took nearly a week to take it down. It was made of very heavy sheet steel and had to be burnt down in

sections. That the property 1 to 15 West Wheeling Street has been used for storing obsolete machinery and then it was used for storing automobiles. A pie company had stored trucks there, and a furniture company stored furniture in it. There was a For Sale sign on the Henrietta Street building and there is still such a sign there. Another witness bought pipes and old lumber from the Henrietta Street property and he testified from his records that he purchased 900 feet of pipes, and lumber consisting of old bins. He said that the property was dismantled, and wooden partitions were taken out of the Henrietta Street property.

Another witness purchased pipe from a man named Pierce who got it from the Kriel place. He removed 40,000 pounds of galvanized, two-inch pipe that had been used for refrigeration from the Henrietta Street building in 1939. Another witness, whose place of business was a block and a half from the Kriel property, purchased in 1940 from the Kriels a part of the real estate that had been used in the slaughtering business. The part purchased on Wheeling Street was a concrete building fifty by twenty-five. He said that he was in all the buildings, both before and after the Kriel Company discontinued business. Afterwards there was machinery and furniture stored in the Wheeling Street building. In November, 1940, when he went through the Henrietta Street building there was no machinery there at all, he said, with the exception of one old piece of machinery on the third floor, which they had used to convey hogs, all the machinery had been removed. He said he had been in the property before it stopped operations and there was machinery all over the place. He saw For Sale signs on the buildings. Mr. Kriel offered to sell him any or all of them. They discussed the sale of the Wheeling Street property, but they could not get together on a price. Another witness, who was connected with some meat packers, testified that in 1937 they bought $1,382.72 worth of all sort of supplies from the Kriel Company. Another witness, who was a part-

ner in a metal company, bought 6,904 feet of one-inch pipe, 2,347 feet of an inch and a quarter pipe, 9,300 pounds of miscellaneous scrap iron, 9,700 pounds of steel scrap, 5,750 pounds of steel scrap, and a lot of boilers for which they paid $650. He totalled the amount paid as over $1,500, and the number of feet of pipe at 9,254 feet. There was testimony by another witness that he saw the men tear down the smokestack; haul out pipe, machinery and equipment; and that furniture had been stored in the main building.

There have been, as we have said, several cases in this court involving the non-conforming use provisions of the Baltimore City ordinance. In one of these it was decided that unless otherwise stated in an ordinance, or statute, mere cessation of discontinuance of a non-conforming use without the substitution of another use, or without evidence of an intent to abandon the non-conforming use, will not prevent its resumption. In that case there was an application for use as a junk shop of certain properties. The testimony showed that these properties had been used for a junkshop before the passage of the ordinance, but that for about three years they had been vacant, and that during the interval of vacancy, they were only used occasionally for the storage of some furniture. This court held that in that case there was not sufficient evidence that the storage of furniture was more than a casual use, and that the mere cessation of business did not constitute an abandonment. In discussing the question of abandonment this court defined it as follows: "Abandonment in law depends upon the concurrence of two, and only two, factors; one an intention to abandon or relinquish; and two, some overt act, or some failure to act, which carries the implication that the owner neither claims nor retains any interest in the subject-matter of the abandonment. 1 C. J. S., Abandonment, Sec. 3, p. 8. Time is 'not an essential element' of abandonment, although the lapse of time may be evidence of an intention to abandon, Id., Sec. 3, p. 9, Sec. 7, p. 16, and where it is accompanied

by acts manifesting such an intention it may be considered in determining whether there has been an abandonment." *Landay v. Board of Zoning Appeals,* 173 Md. 460, 196 A. 293, 297.

The facts in the instant case as to the use made of the property since 1938 do not, in our opinion, show more than a casual use of the property. It was used for the storage of various articles. While this storage, in the case of furniture, was extensive and lasted for a considerable period of time, nevertheless it does not seem to have been intended as a permanent use of the building. We are, therefore, unable to find that any use has been made of the property which would put it in a higher classification.

On the question of abandonment we are confronted by the fact that the Kriel Company sold all the visible machinery, including boilers, pipes used for refrigeration and machinery for moving carcasses from one part of the plant to another. It also took down the smokestack, which was certainly a necessary part of a building to be used for slaughtering and meat packing. No attempt was made to replace the smokestack or the machinery. The statements made by Mr. Kriel were that his company was probably waiting for more favorable opportunities to go back into the business. That is very indefinite. Except for his general statement that the modern machinery was still in the plant, we have no information whatever as to what this modern machinery consisted of, or how much of it there was. The witness who had been through the buildings did not see any machinery there. It must be apparent to anyone with ordinary common sense that the Kriel Company had gone out of the slaughtering business, was trying to dispose of its properties, and had only the vaguest sort of an intention to go back into business at some future day, if conditions should improve. To translate that intention into action would require a considerable investment in machinery and improvements.

This court has recently decided that a non-conforming use cannot be expanded, under the ordinance, to nearby

vacant property on which the owners of the Pimlico race track had planned some day to construct stables. In so holding, Chief Judge Bond, speaking for the court, said: "And it would be unlikely that a zoning ordinance would make provision for so unsubstantial a thing as a plan in mind. * * * A use merely contemplated and unrealized, would certainly not be susceptible to such control. The law would not be concerned to regulate a change of intention." *Chayt v. Board of Zoning Appeals*, 177 Md. 426, 9 A. 2d 747, 749. In a later case, both the Landay and the Chayt cases were cited on the points heretofore noted and this court again indicated its intention not to extend beyond the strict wording of the ordinance, any non-conforming use. *Knox v. Mayor and City of Baltimore*, 180 Md. 88, 23 A. 2d 15.

If a plan in the minds of the owners to use vacant property in connection with an adjacent non-conforming use was not sufficient to classify such property as non-conforming, then clearly an intention some day to go back into a business, which had been to all intents and purposes completely discontinued, should not hold property in a non-conforming status. Non-conforming, as the word itself indicates, means something different from the use which the municipal authorities consider best for the public health, welfare, morals and safety in that area. It is to avoid injustice that zoning ordinances generally except existing non-conforming uses. Some permit their extension to a limited extent, but the public effort is not to extend, but rather to permit to exist as long as necessary, and then to require conformity for the future. The Baltimore City ordinance specifically prohibits the extension of a non-conforming use except to a portion of a building already designed for such use. It also permits a non-conforming use to be changed to a use of the same classification, and that is the basis of the Gudis application. The right of the non-conforming owner, however, is to the use and not to the class of use. He cannot abandon his use of the building and then at some later time claim the right to establish there another use of the same class. As we said in the Landay

case, the mere cessation of the use for a reasonable period does not of itself work an abandonment, but once the abandonment is clearly indicated by intention and action, or failure of action for a sufficient period of time, then the owner has lost his right to the non-conforming use, and must use his property only in conformity with the uses allowed to other properties in the neighborhood. Were the law otherwise an owner could keep his property in an non-conforming class forever, which would be entirely contrary to the policy underlying zoning acts.

In the case before us the Kriel Company disposed of all the visible machinery, altered the structure of the building by taking down the smokestack and definitely discontinued the slaughter house business. This would not have been done had there been any intention of resuming it in any reasonable period. Mr. Kriel's own testimony indicates that he only had a vague intention of going back into the business if there were more favorable opportunities. These opportunities apparently not only never presented themselves, but the actions of the Kriel Company indicated that it did not anticipate they would. It offered all of the property for sale, still has a sign on it, sold one piece, and has sold the lot in question here under some sort of contract to Gudis. There is clearly present an actual abandonment, with an intention no longer to use the property for slaughtering purposes. That use is the only use which would give the applicant the right to his permit. Since that use has been abandoned, the property is no longer non-conforming, but must be used only as other properties in the area can be used under the ordinance. The applicant, therefore, is not entitled to a permit for a non-conforming use.

For these reasons, the order of the lower court will be reversed and the case remanded for further proceedings in accordance with this opinion.

*Order reversed, with costs; case remanded for further proceedings.*