GREEN ET AL. *v.* GARRETT ET AL.

[No. 58, October Term, 1948.]

54

*Decided January 13, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*Wilmer H. Driver* for the appellants.

*Thomas N. Biddison, City Solicitor of Baltimore,* with whom were *Edwin Harlan, Deputy City Solicitor of Baltimore,* and *John J. Ghinger, Jr., Assistant City Solicitor of Baltimore,* on the brief, for the appellee, Department of Recreation and Parks.

*J. Kemp Bartlett, Jr.,* with whom were *Robert D. Bartlett* and *Bartlett, Poe & Claggett* on the brief, for the appellee, the Baltimore Baseball and Exhibition Co.

*J. Nicholas Shriver, Jr.*, with whom were *Cross & Shriver* on the brief, for the appellee, International League of Professional Baseball Clubs.

MARBURY, C. J., delivered the opinion of the Court.

The appellants, who describe themselves as citizens and taxpayers of the City of Baltimore, filed their bill of complaint in Circuit Court No. 2 of Baltimore City against The Department of Recreation and Parks of Baltimore City and The Baltimore Baseball and Exhibition Company to enjoin the Department from entering into any agreement permitting the use and occupancy of the Baltimore Stadium by the Baseball Company for playing of professional baseball, to declare void an agreement of April 2, 1947 for such use for the period from that date to December 31, 1947, and to enjoin the respondents from certain operations of the loud speaker system of the Baltimore Stadium, certain parking operations there, and the use of flood lights there.

The Department filed a demurrer and answer as did the Baseball Company. The International League of Professional Baseball Clubs, of which the Baltimore Club is a member, by its petition, asked to be made a party defendant, and permission having been granted, it adopted the demurrer and answer of the Baseball Company. The case was heard in open court and voluminous testimony was taken over a period of days, after which the Chancellor filed his decree overruling the demurrers, and refusing the greater part of the relief prayed. He prohibited the continuance by the Baseball Company of the use of facilities in the administration building, and he required the public address system to be so operated as not to unnecessarily annoy the adjacent residents. From this decree the complainants appealed. No appeal was taken by the respondents.

A brief statement of facts in connection with the Stadium property and its use is quoted from the opinion of the Chancellor:

"The Baltimore Stadium property is land acquired by the 'Department' prior to 1922 and known at that time as Venable Park. In 1922 it consisted of an abandoned brick yard and other rough scrub land. There was only one house nearby and that has since been demolished. 33rd Street was used as a street but had not been widened. During 1922 Mayor Broening and some of his associates conceived the idea of building a stadium upon the land, in which athletic games of considerable magnitude might be held, the first thereof being the Army-Marine game in the Fall of 1922. From that time until 1939 the Stadium was used infrequently for football games, track meets and civic events. It had been called the 'White Elephant', 'Lonely Acres' and 'The Vast Void', indicative of its general lack of use. A charge was customarily made for the use of the facilities. Former Mayor Broening testified that the proceeds of the first game was divided three ways, that is, one-third to the Army, one-third to the Marines and one-third to the City. The share of the City amounted to $30,000. While some stress was laid by the Complainants upon the use of the land adjacent to the Stadium for landscape purposes, it is certainly true that the only use of the Stadium proper was for games and feature events. It was never used for landscaping in any sense of the word. The infrequent use of the Stadium continued until 1939 when lights permitting night use were installed and beginning with that time the use increased tremendously. Many of the football games and other events were held at night and the increased use may be found reflected in the revenues accruing as a result thereof. A public address system was installed in 1935 and improved upon from year to year and in 1939 the system was modernized and is the one in present use.

"On July 4, 1944, a disastrous fire destroyed the buildings comprising what was then known as Oriole Park on 29th Street and Greenmount Avenue, the permanent home of the 'Club'. Mayor McKeldin of Baltimore City offered the 'Club' the use of the Stadium. It was ac-

58

cepted and the 'Club' completed the 1944 season there. It may be said, without the slightest qualification, that the move was intended to be temporary in nature and no one connected with the 'Department,' 'Club,' 'League' or the complainants had any idea that it would be permanent. It is also true that during the succeeding years the occupancy was considered temporary and as Mr. Reed, President of the 'Club' expressed it, 'not until February, 1947 did the "club" have any idea of being permanently in the Stadium.' It was when the 'Department' offered the 'Club' a long term agreement for the use of the Stadium in February, 1947 and not until that time that the 'Club' abandoned the idea of moving. * * * The 'Club' plays most of its games at night and on Sundays. When played at night the games start about 8 p. m. and last until 10 p. m. for a single game, or start at 6:30 and last until 10:45 p. m. if a double header is played. On Sundays the games begin in the afternoon and are over by dusk. There can be no doubt that the games played by the 'Club' have produced a 'use' of the Stadium greatly in excess of its former use. Many citizens count that as highly desirable because it lightens the tax burden of carrying the Stadium property. The complainants who live nearby consider it very undesirable because of the noise, confusion and disturbance it produces."

The first matter for our consideration is whether the appellants, as taxpayers, have a right to bring this suit. The use of the Stadium for professional baseball has resulted in a profit instead of a deficit, and the public, in general, has benefited thereby. Taxpayers have sufficient standing to bring suits against municipal authorities to prevent the waste of public funds or property, but a different situation arises where a profitable arrangement made by the municipality is sought to be restrained. The subject is discussed in *Sun Cab Company v. Cloud,* 162 Md. 419, 159 A. 922, and *Baltimore Retail Liquor Package Stores Ass'n v. Board of License Commissioners,* 171 Md. 426, 189 A. 209, 109 A. L. R. 1253. However, our Courts have taken jurisdiction of a taxpayers' suit

to enjoin the diversion to profitable but unlawful use of park property in Baltimore City (*Hanlon v. Levin,* 168 Md. 674, 179 A. 286), and there is no doubt that as adjacent residents and property owners, the appellants have an interest in restraining conditions arising out of the contract, which constitute a special nuisance to them. *Hart v .Wagner,* 184 Md. 40, 40 A. 2d 47; *Five Oaks Corporation v. Gathmann,* 190 Md. 348, 58 A. 2d 656. The decisions are not entirely harmonious, but we have heretofore allowed considerable latitude in this type of suit, and we have, therefore, concluded to consider the entire case without questioning the right of appellants to bring any phase of it.

One other preliminary matter should be mentioned. The International League of Professional Baseball Clubs filed a motion to dismiss the appeal on the ground that the bill of complaint, filed December 23, 1947, attempted to enjoin the yearly contract which would expire in eight days, and which had expired prior to the hearing of the case. It therefore contends that the case is moot. However, the bill of complaint asked for a general injunction against the execution of any agreement, and as another yearly agreement was entered into for the baseball playing year of 1948, and further agreements are contemplated for the permanent use of the Stadium by the Baseball Company, we do not think the questions involved are moot, and the motion will be denied.

The appellant's first contention is that the Department of Recreation and Parks has no power or authority to enter into an agreement with the Baseball Company, giving the latter the privilege of using the Stadium for professional baseball. The powers of the Department are found in Section 96 of the Amended Baltimore City Charter of 1946. By the provisions of this Section the Board of Recreation and Parks, which is the head of the Department, is authorized "(a) to establish, maintain, operate and control * * * athletic and recreational facilities and activities for the people of Baltimore City * * * and (g) to charge and collect * * * rental

for the use of property controlled by it; * * * pro-
vided that no lease of such facilities shall be made for a
period of thirty day or more (or for successive periods
aggregating thirty days or more) without the prior ap-
proval of the Board of Estimates". The contention of
the appellants is that these powers should be strictly con-
strued, and that the Department should not have broader
powers with reference to the execution of leases of prop-
erties than the municipal corporation itself. They point
out that in the case of *Hanlon v. Levin, supra,* the Board
of Park Commissioners, one of the predecessors of the
Department, had leased a part of Druid Hill Park, one of
the public parks of Baltimore City, to the Baltimore
Broadcasting Company. On this tract a broadcasting
tower and building were to be constructed for use in
connection with Radio Station W C B M. The lease was
for a term of ten years. Druid Hill Park had been
acquired by the City, and not by the Park Board. There
were certain provisions in the Charter, then in force,
which provided for advertisement before any franchise
or the right to use any public property could be granted,
and the court said the City could not lease public prop-
erty to private parties so long as it was needed for public
use. The provisions of the Charter, then in force, with
respect to the Board of Park Commissioners, authorized
that Board "to rent or lease property which it may acquire
on behalf of the City". The court said that authority
limited the Park Board to the leasing of property which
it had acquired, that it could not lease property which
the City had otherwise acquired, and that its power was
not broader than the power of the City above referred to.
The appellees, however, call attention to the fact that
the present charter does not restrict the right of the
Department to lease only land acquired by it, but refers
to the collection of rentals for the use of property "con-
trolled by it". They contend that the provision with
respect to leasing shows clearly that it was the intention
to give the Department, subject to the approval of the

Board of Estimates, for leases over 30 days, power to lease the facilities under its control.

The Baltimore Stadium was constructed as a sports center to be used for all purposes for which such a building could be used. It has been, since its construction, the scene of many athletic events. These have by no means been confined to those between residents of the City of Baltimore, such as the annual football games between the Baltimore City College and the Baltimore Polytechnic Institute. Many of the football games of the United States Naval Academy have been played there. It was used for the Army-Marine football games, and subsequently for the annual games between the Marines and the Firemen. In its very earliest days it was used for professional football games, and it is now being used during the football season by the Baltimore professional football team. Many of the great college football teams of the country have played there. It is obvious that it was never intended that the athletic and recreational facilities which the Department is allowed to conduct there, should be those only in which residents of the City were physically engaged. Recreation is a broad term, and it would be an unnatural use of it to say that it does not apply to watching a football or baseball game, but only applied to engaging in one. From the onlooker's point of view, a game conducted by professionals is often more interesting than one played by amateurs. The very purpose of a stadium is to afford facilities for spectators. The players need only the ground to play upon.

It is conceded that at the time the stadium was built, and for some time thereafter, it was not expected that the Baltimore professional baseball team, generally known as the Orioles, should occupy it. They then had their own park, referred to in the Chancellor's statement of fact, but this park was destroyed at a time when it was practically impossible to rebuild it, and at a time when the baseball season was at its height, games being scheduled every day. As a result, the Orioles transferred their activities to the Stadium, but their occupancy, at

that time, was expected to be temporary only. However, it became apparent that it would be impossible to build a baseball park for several years, and the Department permitted them to remain there, and contemplates now giving them a lease for a period of years, so that they can occupy it during the spring and summer when baseball is played. This occupancy is not intended to be exclusive. It does not interfere with other events at times when the baseball team is playing in other cities away from home. It does and will constitute a much greater use of the Stadium for professional activities than has heretofore been made of it, but it cannot be said that this exceeds the power reposed in the Department or the Board of Recreation and Parks to maintain athletic and recreational facilities and activities for the people of Baltimore. Watching games of baseball, and particularly a game of professional baseball, is to many people in this country the greatest possible recreation with respect to athletic activity. We think the Department has ample power to recognize this, to provide such recreation, and to enter into a long term lease if it and the Board of Estimates think it advisable, and for the interest of the City and of its people to do so. A contention similar to that of the appellants was made in the case of *Clarey v. Philadelphia,* 311 Pa. 11, 166 A. 237, where the leasing of the municipal convention hall for professional sporting events was questioned as an unlawful use because the ground on which the hall was built was a public park. The court held in that case that the contention was absurd, that such a building was not required for public gatherings for more than a small portion of the time, and that leasing it for professional sporting events when it was not needed for public use was for the mutual advantage of the taxpayers, and those permitted to use it. In our opinion, the wording of the Charter gives the Department a wide discretion to determine what are athletic and recreational facilities, and it has ample power to include professional baseball as part of the facilities at this location. This is a use for the benefit

of the public, and comes within the scope of the Charter provision. In this respect the case before us is quite dissimilar to that of the *Board of Park Commissioners of Ashland v. Shanklin,* 304 Ky. 43, 199 S. W. 2d 721, much relied upon by the appellants.

The second contention of the appellants is that the use of the Stadium for the playing of professional baseball contravenes the zoning ordinance of Baltimore, because it is located in a district of Baltimore City which is zoned for residential use. The zoning ordinance was passed in 1931, after the Stadium was built, and after it had been used for professional football games, and at least one professional baseball game. It had also been used for football games by the United States Naval Academy, for which purpose it had been leased. There was, therefore, a non-conforming use, established before the adoption of the zoning ordinance, which the Department was entitled to continue. The appellants contend that the enlargement of this use to include professional baseball games for a considerable period of a year is not within the exemption, but we cannot so find. We held in the recent case of *Colati v. Jirout,* 186 Md. 652, 47 A. 2d 613, that the spirit of the zoning ordinance is against the extension of non-conforming uses, and that such uses should not be perpetuated any longer than necessary. We have never held that the more frequent use of a property for a purpose which does not conform to the ordinary restrictions of the neighborhood is an extension of an infrequent use of the same building for a similar purpose. We do not think such a contention is tenable. Nor does it seem to us that a different use is made of the Stadium when the players of games there are paid. The use of the property remains the same. And, if it does not, the zoning ordinance permits a non-conforming use to be changed to a use of the same classification. *Beyer v. Mayor and City Council of Baltimore,* 182 Md. 444, 34 A. 2d 765.

Since we find that the Department had and has power to lease the Stadium under the Charter provisions for the

playing of professional baseball, and that such use is not an extension of the non-conforming use heretofore existing, we come to the question whether the actual use of the property by the Baseball Company constitutes such a nuisance to the appellants as to justify the court in granting the injunction they ask. It must be borne in mind, as in all such cases, that living in a city entails the endurance of certain inconveniences and discomforts, and those who have established their residences there cannot expect to have the quiet and peace of the countryside. *Five Oaks Corporation v. Gathmann, supra.* They purchase their homes, and live in the city subject to the right of the municipal authorities, if in the judgment of those authorities it is in the interest of the entire community to operate such recreation facilities as may be reasonable and proper. That, however, does not permit those who are operating games at the Stadium to unduly oppress or discommode the neighboring residents. The question before us is to what extent, if any, the operation of professional baseball in this Stadium exceed the ordinary and the usual, and infringes upon the rights of the appellants.

The Chancellor has, we have said, enjoined the use of the public address system, as it had been operated. This had been used to produce, not only announcements pertaining to the games, but also music and other entertainment features which were undoubtedly destructive of peace and quiet. They were wholly unnecessary for the use of the Stadium, and the Chancellor was undoubtedly correct in enjoining them, although no appeal was taken by the respondents, and this question is not before us.

Many of the baseball games are played at night and one of the chief complaints is that the lights on top of the Stadium are tilted in such a manner as to shine directly across the Stadium into the windows of a number of the appellants and others whose residences are nearby. The actual lighting up of the area is, of course, a necessary concomitant of playing night baseball, but in order

to illuminate the playing field it is not necessary to project blinding lights into peoples' homes. This can be especially vexatious in the summer time when nights are frequently warm and windows are open. The individual home owners are entitled to be protected from that sort of annoyance. It is admitted, however, that the lights can be adjusted so as to obviate this difficulty, and we think the appellees should be enjoined from permitting it to continue, and whoever has to pay for the change under the arrangements between them.

Another question raised by the appellants is the clouds of dust which result from automobiles bringing people to the games, and parking in the parking area adjacent to the Stadium. Such automobiles also, at times, block the entrances to the homes, so that the residents cannot get their own cars out. There is testimony which clearly indicates that this has happened a number of times. It seems to us to be clear that these complaints result because the parking lots adjacent to the Stadium and on land controlled by the Department, are unpaved and are practically nothing but a dirt field. The driving of cars on and off such a field every day or night would necessarily produce dust in quantities, and those attending games, who want to get away from this dusty parking place have blocked the driveways and entrances of the homes in the neighborhood by parking on the street in front of them. All of this could be obviated if the Department would provide a sufficiently large paved parking place around the Stadium, on land owned by it, where cars could be parked without creating a nuisance. This is so obviously necessary for a Stadium of the size of the one in question, that it seems remarkable it has not been done long ago. We think the appellees should be enjoined from using these parking places further until such paving is done, and that any contract made between the appellees for the further use of the Stadium should provide for such paving. Who is to do it, and how it is to be done, is not before us, but what is before us, is

the continuance of a nuisance created by an unpaved parking place and we think this should be enjoined.

The last grievance is the unseemly behavior and disorderly conduct of individuals in the crowds going to and from ball games. In every crowd there are persons who, for some reason or other, seem unable to behave as normal, decent citizens should, but that is not a matter that can be taken care of by either the Baseball Company, which controls only the inside of the Stadium, or by the Department of Parks and Recreation, which has only a limited police force at its disposal. It can, however, be readily handled by the ordinary police, and we have no doubt, if it is brought especially to the attention of the Police Commissioner, he will see to it that enough policemen are assigned to take care of it and to prevent its occurrence. Much of it may be due to the parking conditions above referred to, and may disappear when they are remedied. The Police Commissioner is not a party to this proceeding, and we see no occasion for any action by the court in connection with this matter.

There are a number of English cases dealing with the problems of the obstruction of a highway and the denial of the access to adjacent premises by crowds assembled because of lawful entertainments or businesses on adjacent property. One of these cases is *Barber v. Penley,* Law Reports (1893), 2d Ch. 447. Another is *Lyons, Sons & Co. v. Gulliver,* Law Reports (1914), 1st Ch. 631. These two cases, and the numerous earlier authorities cited, hold that where, by virtue of an entertainment or business advertisement, large crowds of people gather in front of a plaintiff's premises preventing proper access to it, a nuisance is created against which an injunction will be granted in a proper case. Such an injunction, however, is not granted as a matter of right or upon the immediate presentation of the case because it is generally found that measures can be taken by the parties themselves to get the services of an adequate police force which will correct the situation. The fact that it is a police matter is not regarded as a complete and absolute

defense because the defendants in such cases have produced a nuisance, and if it cannot be abated by the police, the English judges do not hesitate to state that they would enjoin an entire entertainment or advertisement. There is, however, on this point a strong minority opinion in *Lyons, Sons & Co. v. Gulliver, supra,* by Phillimore, L. J., in which he contends that every trader has a right to make his shop window as attractive as possible, that he is not responsible for crowds assembling to gaze at that shop window, and that it is for the police to regulate the traffic and to make these persons move on if they interfere with the business of other people. In the late case of *Dwyer v. Mansfield,* Law Reports, 19 K. B. D. (1946) 437, the court held that a shopkeeper, doing business in a normal way, was not guilty of a nuisance because of customers crowding to his shop. On the other hand, the contrary was held, where the sale was made in an unusual way. *Fabri v. Morris,* 1947 All Eng. Rep., Vol. 1, 315.

The decree will be affirmed in part and reversed in part and the case remanded for the passage of a new decree in accordance with this opinion.

*Decree affirmed in part and reversed in part and case remanded. Costs to be paid by the appellees.*