862 A.2d 1204 (2004)
373 N.J. Super. 603
S & S AUTO SALES, INC., Plaintiff-Appellant,
v.
ZONING BOARD OF ADJUSTMENT FOR the BOROUGH OF STRATFORD, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued November 4, 2004.
Decided December 22, 2004.
*1206 John-Paul Madden, Haddonfield, argued the cause for appellant (Madden, Madden & Del Duca, attorneys; Mr. Madden, on the brief).
Stuart A. Platt, Pennsauken, argued the cause for respondent (Marrazzo & Platt, attorneys; Mr. Platt, on the brief).
Before Judges CONLEY, BRAITHWAITE and LISA.
The opinion of the court was delivered by
LISA, J.A.D.
This appeal requires determination of whether a nonconforming use has been abandoned and the standard by which that determination should be made. Applying a subjective test, the Stratford Zoning Board of Adjustment (Board) found that the owner did not establish the intention to continue the use, and declared the right to the use terminated. The Law Division affirmed, but applied an objective test of abandonment, without regard to the owner's intent. We hold that the Board applied the correct test, but the result it reached is not supported by the evidence. We further hold that the test applied by *1207 the Law Division is not authorized under New Jersey law. We therefore reverse.

I
Because our decision rests in part on an evaluation of the Board's factual findings, it is necessary that we set forth in some detail the facts. S & S Auto Sales, Inc. (S & S) began operation of a used car dealership at 1010 South White Horse Pike (Route 30) in Stratford in 1993. Prior to that time, the premises were devoted to the same use. The location is a corner property measuring 200 feet by 200 feet on a busy commercial highway. It contains a freestanding building, two large freestanding signs and a sixty-foot flagpole. The paved lot can hold thirty-five to forty cars for display. The building is set up with small offices for use by car salespersons, and contains large plate glass showroom windows. Typical of an automobile dealership operation, the building is relatively small and surrounded by a large lot. Important to such an operation is the visibility resulting from substantial frontage on a busy highway.
The property is in a C-Commercial Zone. There is no dispute that when the automobile dealership was initially established, at some undisclosed time before 1993, it was a permitted use. Under the current zoning regulations, a car dealership is not a permitted use.[1] S & S operates several automobile dealerships in the Stratford area. In 1995, S & S entered into a fifteen-year lease-purchase agreement with the owner of the property, permitting S & S to purchase the property for one dollar at the end of the lease term. Thus, S & S is the property's equitable owner. S & S continuously and actively sold cars from the site from 1993 until the summer of 2001.
In August 2001, lacking sufficient trustworthy employees to staff the Stratford site, S & S removed the inventory of vehicles to its other locations and ceased sales operations at Stratford. S & S also removed two metal ramps used to display featured vehicles in an elevated position. Several cement bumpers were moved from the back of the lot and positioned to block the driveways, preventing vehicular access to the lot. No other exterior changes were made. The signs and flag pole remained in place, as did the banners that adorned the front of the property. The signs were continuously lit at night at all times after August 2001.
On October 24, 2001, the attorney for Stratford's Planning Board wrote to S & S, confirming that business operations had ceased, acknowledging the nonconforming use status, and advising that "subject to any additional information received" the Borough "considers that neither [the legal owner nor S & S] have an interest in maintaining the use for the subject property." The letter invited advice to the contrary. S & S's attorney responded on November 8, 2001 that S & S "does not intend to abandon its right to utilize the property for used car sales" and "intends to resume operations in the very near future on the property. They have no present plans to use the property for any other purpose." On November 15, 2001, the Planning Board attorney confirmed receipt of the letter on behalf of S & S, expressed "the Borough's interest to have a pre-existing nonconforming use no longer in *1208 operation" and stated "the Borough will continue to monitor the situation."
In July 2002, S & S did not receive in the mail from the Borough the customary forms for annual renewal of the business and signage licenses. On July 15, 2002, S & S made a written inquiry requesting the forms and informing the Borough it "still intend[ed] to operate this location for automotive sales." After several weeks with no response, Angela Shtutman, a principal of S & S, went to the municipal building to follow up on the request. The Zoning Board secretary informed her the Borough deemed the nonconforming use abandoned and she would have to appear before the Board for a determination of the issue. Borough officials refused to process any license renewal applications.
S & S promptly applied to the Board, seeking a determination that it had not abandoned its nonconforming use.[2] The Board conducted a hearing on September 26, 2002, at which Shtutman explained in detail S & S's activities with respect to the Stratford site over the previous thirteen months. By August 2001, the number of employees staffing the Stratford site had dwindled from five to one. After unsuccessful efforts to find suitable help to run the facility properly, operations were stopped. Throughout the remaining months of 2001, S & S advertised for help. Its preference was to obtain a partner, who would have an equity interest. Six to twelve people were interviewed during those months, but no arrangement resulted. These efforts were consistent with S & S's representations to the Borough in November 2001 that it intended to resume operations in the near future.
By January 2002, S & S decided to change course. Rather than resuming the operation, individually or with a partner, it would attempt to sublease or sell the property. All marketing efforts were directed at car dealers or prospective car dealers only, and the property was marketed only as an automobile dealership facility. The property was offered as a "turn key" operation, with all furniture, equipment and supplies included for immediate initiation of business. The advertisements stated that the use complied with local zoning.
Shtutman described the various marketing techniques used and produced corroborating documentation, including copies of the ads and billing records. Initially, S & S sent out two waves of mailers to all new and used automobile dealers in the tri-state area. These contained a picture of the property and other information and advertised the property for lease, with a monthly rent specified. Shtutman also distributed these ads three times a week at automobile dealer auctions.
Next, S & S engaged the services of a marketing company that made three waves of fax solicitations to about 532 used and new automobile dealers in the tri-state area. These were sent on March 25, April 1 and May 10, 2002. They offered the property for lease or sale, with amounts specified. The lease amount was about 10% lower than in the earlier ad. In May or June, S & S also advertised the property in the Shopper Auto Mart, a car magazine distributed without charge to the public at convenience stores, fast food restaurants, and similar establishments.
At the hearing, Shtutman stated S & S was continuing its marketing efforts, but also expressed the possibility that if efforts continued to be unsuccessful S & S would resume the operation. S & S was an *1209 active business entity, operating other car dealerships in the immediate area. Throughout the thirteen-month cessation of operations at Stratford, S & S kept its lease-purchase agreement current. By that time, it was about one-half way through the fifteen-year agreement and had a substantial stake in preserving the nonconforming use status of the property.
During the thirteen months, S & S maintained electricity and water service, and, as we have stated, lit the signs every night. Real estate taxes were kept current. In the spring of 2002, the telephone service was discontinued, and in September 2002, the yellow pages ad was not renewed for the upcoming year. Of course, the telephone service was not needed during the cessation of operations, and because it was still S & S's primary goal to lease or sell the property to a third party, renewing the yellow pages ad was not deemed necessary.
S & S did not remove any contents from the building. All telephone equipment and the attendant paging system were left intact. The computers, set up specifically for automobile dealership use, remained on the premises, although they were placed in the attic for security reasons, because on the first floor they would be in plain view through the large windows. All furniture, file cabinets, forms, equipment and supplies needed to operate the business remained on the premises.
Throughout the thirteen months, S & S paid a company to provide weekly lawn and landscape maintenance. It kept the property insured, and the policy it produced for the Board was in effect from November 2001 to November 2002, and designated the "Business Description" as "USED AUTO DEALER." The placement of the concrete bumpers was to prevent people from driving through or parking in the lot. The ramps were not necessary for operation of the business; they were removed to prevent their theft. Of course, the concrete bumpers could be moved in minutes and, if desired, the ramps could be returned in short order.
Shtutman steadfastly informed the Board the cessation of the automobile dealership use was always intended to be temporary and, with everything left in place, the use could again "be operational in two days." Throughout the thirteen months, the property was never used for any other purpose. No equipment was brought onto the property to render it useable for other purposes. No efforts were ever made to sell or lease it for any other purpose. No physical changes were made to the property.
At the conclusion of the hearing, the Board's attorney instructed the members on the legal standard they were to apply:
The abandonment ... is a very fact sensitive inquiry. And it's important to examine the intention of the applicant/owner/equitable as well as the actions taken with regard to the pre-existing non-conforming use.... The board must look very closely at the facts bearing in mind the testimony of the owner must as to intention must accord, meaning must equal, must match, with the owner's actions. Notwithstanding the owner's declaration to the contrary[,] use of the premises for purposes other than non-conforming use unless it be shown that such uses were only intended to be transitory would point toward abandonment of the use by the owner.
The Board voted to deny S & S's application for a declaration of non-abandonment. In its memorializing resolution, adopted October 23, 2002, the Board made these findings of fact in support of its conclusion that "the actions of the applicant show a clear intention to abandon the pre-existing *1210 nonconforming use of the property as automotive sales":
1. The applicant admitted that the site does not look like an operational business.
2. There is no inventory as all 35 cars had been removed.
3. There is no staff and the applicant testified that she could not find qualified staff in 13 months and nothing has changed for her to be able to staff the business.
4. The license to sell automobiles has not be[en] renewed.
5. All equipment has been removed from the outside and stored upstairs in the existing building.
6. The applicant did not renew the advertisements for the business.
7. The applicant disconnected its phones.
8. The property has not been subleased to the any of the dealerships.
9. The property is not being used for any business at this time nor has it been for the past 13 months.
10. A review of Exhibit B-1 (photograph of the site in its current condition) in contrast with Exhibit B-4 (photographs while business was operational) shows an extreme difference in appearance where previously the business appeared operational and now it appears to be abandoned.
11. There was two outside car ramps that have been removed. These car ramps were heavy and tow trucks were needed to remove them.
12. The applicant has stopped selling cars or stopped conducting any business due to not having staff for the past 13 months.
13. There are no other operations ongoing at the property.
14. There have been no sales of cars on the property in 13 months.
15. The lettering on the existing sign was peeling.
16. Documents submitted by the applicant under Exhibit A-4 did not show continuous payments or usage of the electric utility or insurance for the property or business.
17. The applicant has installed cement bumpers which have blocked access to the driveway of the subject property.

II
It is undisputed that S & S's use of the property as an automobile dealership enjoyed the status of a nonconforming use, N.J.S.A. 40:55D-5, as of August 2001. Nonconforming uses "may be continued upon the lot or in the structure so occupied and any such structure may be restored or repaired in the event of partial destruction thereof." N.J.S.A. 40:55D-68. It is the burden of the property owner to establish the existence of a nonconforming use as of the commencement of the changed zoning regulation and its continuation afterward. Ibid.; Ferraro v. Zoning Bd. of Keansburg, 321 N.J.Super. 288, 291, 728 A.2d 863, 864-65 (App.Div.1999).
Abandonment of a nonconforming use terminates the right to its further use. Borough of Saddle River v. Bobinski, 108 N.J.Super. 6, 16, 259 A.2d 727, 732-33 (Ch.Div.1969). The traditional test of abandonment requires the concurrence of two factors: (1) an intention to abandon, and (2) some overt act or failure to act which carries a sufficient implication that the owner neither claims nor retains any interest in the subject matter of the abandonment. Id. at 16-17, 259 A.2d at 732-33. This so-called subjective test was applied by the Board in this case.
*1211 A nonconforming use is a valuable property right. Scavone v. Mayor and Council of Totowa, 49 N.J.Super. 423, 428, 140 A.2d 238, 241 (App.Div.1958). Temporary non-use does not constitute abandonment. Children's Institute v. Verona Tp. Bd. of Adj., 290 N.J.Super. 350, 357, 675 A.2d 1151, 1154 (App.Div.1996). A change in ownership or tenancy does not terminate a nonconforming use, Arkam Machine & Tool Co. v. Lyndhurst Tp., 73 N.J.Super. 528, 533, 180 A.2d 348, 350 (App.Div.1962), nor does the temporary inability to find a new tenant. Campbell v. Bd. of Adj. of So. Plainfield, 118 N.J.L. 116, 191 A. 742 (Sup.Ct.1937).
In cases such as this, where cessation of active use is the circumstance that creates the issue of entitlement to resume active use, the owner will invariably state that his or her intention was to continue the use. Otherwise, there would be no dispute. That statement is the beginning, not the end, of the inquiry. The clear policy of this State is to eliminate nonconforming uses as quickly as is compatible with justice. Town of Belleville v. Parrillo's, Inc., 83 N.J. 309, 315, 416 A.2d 388 (1980). An unsubstantiated assertion of intention cannot carry the day, for that would substantially impair, if not defeat, advancement of the elimination policy. Rather, the owner must demonstrate that the intention to continue the use is a continuing and definite intention, Villari v. Zoning Bd. of Adj. of Deptford, 277 N.J.Super. 130, 137, 649 A.2d 98, 101 (App.Div.1994), which must be substantiated by all of the circumstances surrounding the cessation. The owner bears the burden of proof by a preponderance of the evidence.
Consistent with these principles, courts have found circumstances that negate an expressed intent to continue a nonconforming use. See, e.g., Parrillo's Inc., supra, 83 N.J. at 316, 416 A.2d at 391-92 (change in use from restaurant to discotheque terminated nonconforming use); Villari, supra, 277 N.J.Super. at 136-37, 649 A.2d 98 (change in use for at least seven years from raising pigs to growing crops, during which fence needed for raising pigs was not maintained, terminated nonconforming use); See also Beyer v. Mayor and Council of Baltimore City, 182 Md. 444, 34 A.2d 765, 769 (1943) (disposal by slaughter house operator of all necessary machinery, removal of smokestack, and use of building for storage terminated nonconforming use); Brown v. Gambrel, 358 Mo. 192, 213 S.W.2d 931, 937 (1948) (lease of premises for a use different from the nonconforming use constitutes abandonment). Such circumstances might well be characterized as objective manifestations of the owner's intent to abandon the nonconforming use. See Tp. of Fairfield v. Likanchuk's, Inc., 274 N.J.Super. 320, 329, 644 A.2d 120, 124-25 (App.Div.1994). Contrary manifestations may corroborate and substantiate the expressed intent to continue the nonconforming use. Such circumstances, pro or con, must be qualitatively weighed to determine whether the owner has met his or her burden of establishing a continuing and definite intention to continue the use.

III
We now apply these principles to the case before us. The scope of judicial review of the decisions of local land use boards is well settled. Courts must give substantial deference to such decisions. Medical Ctr. v. Princeton Zoning Bd. of Adj., 343 N.J.Super. 177, 198, 778 A.2d 482, 495 (App.Div.2001) (citing Ward v. Scott, 16 N.J. 16, 23, 105 A.2d 851, 855 (1954), and Hawrylo v. Bd. of Adj., Harding Tp., 249 N.J.Super. 568, 578, 592 A.2d 1236, 1240-41 (App.Div.1991)). Courts will interfere only if the decision is arbitrary, *1212 capricious or unreasonable. Kramer v. Bd. of Adj., Sea Girt, 45 N.J. 268, 296, 212 A.2d 153, 169 (1965). A local board's action is presumed valid, and the burden is on the challenger to show otherwise. New York SMSA Ltd. P'ship v. Bd. of Adj. of Bernards, 324 N.J.Super. 149, 163, 734 A.2d 817, 825 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999). A reviewing court may not substitute its judgment for that of the local board. Kramer, supra, 45 N.J. at 296, 212 A.2d at 169. If the board's decision is supported by substantial evidence, a court may not interfere. Ibid.
The memorializing resolution adopted by the Board provides the source of its findings and conclusions. Scully-Bozarth Post # 1817 of Veterans of Foreign Wars of U.S. v. Planning Bd. of City of Burlington, 362 N.J.Super. 296, 312, 827 A.2d 1129, 1138 (App.Div.), certif. denied, 178 N.J. 34, 834 A.2d 407 (2003). The Board recited seventeen findings of fact. Eight of them (1, 2, 3, 8, 9, 10, 12 and 14) are redundant, stating in different ways the obvious, that during the thirteen months between August 2001 and the Board hearing in September 2002, S & S ceased operations. Removal of the ramps to one of S & S's other sites (11), placement of the concrete bumpers in front of the driveway (17), and the peeling of letters on one of the signs (15), are irrelevant, or, at most, insignificant. Likewise, we find no relevance in termination of telephone service (7), unneeded during cessation of operations, and the lapse of the yellow pages ad (6), when the primary effort was to lease or sell the premises to a different entity. The record does not support the finding that outside equipment was stored inside the building (5). The finding that S & S did not produce all electric utility and insurance records for the thirteen-month period (16) is literally true, but is a distortion of the record. Shtutman produced some records and advised the Board she could produce the others if requested. No request was ever made.
The remaining two findings support S & S's non-abandonment assertion. The Board found that the license to sell automobiles was not renewed (4). But S & S attempted, in writing and in person, to renew the license. The Borough refused. The attempt is clearly evidence supporting S & S's non-abandonment assertion; the Borough's refusal to allow renewal can hardly be considered evidence of S & S's intent not to renew. After reciting a finding that S & S stopped selling cars for the previous thirteen months, the Board found that there "are no other operations ongoing at the property" (13). (Emphasis added). Of course, if S & S did conduct some activity other than car sales, that change in use would be strong evidence of intent to abandon. Failure to conduct any activity other than that embodied in the nonconforming use supports S & S's asserted intent not to abandon.
Glaringly missing from the Board's findings is any mention of S & S's ongoing efforts to cause a resumption of automobile sales activities, either through hiring suitable employees, taking on a partner, or sale or sublease to a third party. Shtutman's testimony was uncontradicted, was supported by documentation, and was bolstered by the fact that S & S continued to build on its substantial equity in the property by continuing to pay on the lease-purchase agreement. Missing also is that no efforts were made to use or market the property for use for any other purpose; that no physical or structural changes were made; that the building, lot and signage remained set up as a car dealership; that all necessary furniture, equipment and supplies remained on the premises, *1213 which could be in operation on two days notice; and that S & S repeatedly informed the Borough of its intention to continue the use.
It is clear to us that the Borough equated cessation of active operations with abandonment, as evidenced by its letter in October 2001, only two months after cessation. It is equally clear that the Board did the same, repeatedly stating in support of its abandonment conclusion its finding that there were no operations for thirteen months, while turning a blind eye to the overwhelming evidence supporting S & S's asserted intention to not abandon the nonconforming use.
Mere passage of time during a cessation of active use does not constitute abandonment. The length of time that passes is a factor in the overall circumstances to be considered. There is no formula. Courts have found non-abandonment with cessations of actual use much longer than what occurred here. See, e.g., Children's Institute, supra, 290 N.J.Super. at 357, 675 A.2d at 1154 (office building  four years); Bobinski, supra, 108 N.J.Super. at 17-19, 259 A.2d at 733-34 (horse barn  twenty-seven years); Campbell, supra, 118 N.J.L. at 117, 191 A. at 742 (gasoline and service station  several years). As the passage of time increases, the weight attributable to that circumstance grows heavier. But two things must be kept in mind: (1) some discontinued uses are more readily revivable than others, and (2) the passage of time must be considered in conjunction with all circumstances, including those that caused the cessation, the nature and quality of efforts being made to resume the use, and any other objective manifestations supporting or negating the owner's expressed intention to continue the use. And it must be remembered that the intention must be a continuing and definite one. To be meaningful to the analysis, the passage of time factor must be viewed in this context, not in isolation.
The record in this case leads to the inescapable conclusion that during the thirteen months of cessation of business activities at the Stratford site, S & S possessed the intent to resume or cause to be resumed the sales of automobiles at that site, its intent was continuing and definite throughout the thirteen months, and its expressed subjective intent was substantiated by its ongoing and unwavering objective manifestations of intent. The Board's contrary finding is not supported by substantial evidence in the record, and its decision is therefore arbitrary and unreasonable and cannot withstand judicial scrutiny.

IV
Our analysis cannot end here. We have thus far considered application of the traditional abandonment test, utilized by the Board. But in upholding the Board's action the trial judge applied an objective test. On appeal, the Board alternatively argues that an objective test should apply and serve to uphold its and the trial judge's decision. Such a test would authorize termination of a nonconforming use without regard to the owner's intent. In our view, no such objective test exists in New Jersey.
The objective test referred to by the trial judge and the Board derives from two cases decided by this court, Camara v. Bd. of Adj. of Belleville, 239 N.J.Super. 51, 570 A.2d 1012 (App.Div.1990), and Villari, supra, 277 N.J.Super. 130, 649 A.2d 98, decided four years later. Camara involved not a nonconforming use, but a nonconforming structure, a sign. When the use of the property changed from a liquor store to a chiropractic office (both permitted uses), the chiropractor sought to *1214 use the existing sign, but appropriately change its message. Camara, supra, 239 N.J.Super. at 53, 570 A.2d at 1013-14. However, the sign projected more than six inches from the building and, after the liquor store sign was in place, Belleville adopted an ordinance limiting signs in the district to a projection of not more than six inches. Ibid. Thus the sign became a nonconforming structure. The ordinance further provided that at the termination of a business, all signs pertaining to the business must be removed. Id. at 57, 570 A.2d at 1015-16.
The majority rejected the chiropractor's argument that the sign, projecting more than six inches, enjoyed protection as a nonconforming structure. They reasoned that termination of the liquor store business, of which the sign was a part, was tantamount to termination of a nonconforming structure through total destruction. Id. at 59, 570 A.2d at 1017. Therefore, the practical effect of the ordinance provision requiring removal of signs upon termination of a business was "to render termination of the liquor store business as synonymous with abandonment of the nonconformity. In this context, the abandonment is based on the objective conduct of terminating the liquor store business to which the sign related .... [and] manifests an intent to relinquish, discontinue and abandon the nonconformity related to the liquor store sign." Ibid., 570 A.2d at 1016 (emphasis added).
Thus, the majority deemed the nonconforming protection to cease, in effect, by operation of law, as in the case of total destruction, without regard to the owner's actual intent. See id. at 56, 570 A.2d at 1015 (citing Avalon Home & Land Owners v. Borough of Avalon, 111 N.J. 205, 211-12, 543 A.2d 950, 953-54 (1988); Hay v. Bd. of Adj. of Fort Lee, 37 N.J.Super. 461, 465, 117 A.2d 650, 652 (App.Div.1955)). Total destruction, whether by the owner's design or by accident (such as fire), terminates the nonconforming use. Hay, supra, 37 N.J.Super. at 465, 117 A.2d at 652 (citations omitted). Intent is obviously not relevant in that context.
In its discussion in Camara, the majority noted that the Connecticut Supreme Court had recently recognized that "a nonconforming use or structure may be terminated based on cessation of use independent of any intent to abandon the nonconforming use or structure." Camara, supra, 239 N.J.Super. at 57, 570 A.2d at 1015 (citing Essex Leasing, Inc. v. Essex Zoning Bd. of Appeals, 206 Conn. 595, 539 A.2d 101, 103-05 (1988)). We will comment further on the Essex Leasing case later in this opinion.
The dissenter rejected the majority's analysis. He acknowledged that Belleville's sign ordinance could be interpreted as the majority did, but "thus interpreted, [it] would be contrary to N.J.S.A. 40:55D-68 and hence invalid." Id. at 62, 570 A.2d at 1018. He anticipated that, under the majority's theory, intervening ordinances prohibiting signs or limiting their size or placement or prescribing more stringent building setback requirements could be applied to authorize municipalities to require removal or relocation of signs or buildings that had become nonconforming structures simply because of a change in the business conducted on the premises. Id. at 64, 570 A.2d at 1019. In his view, "N.J.S.A. 40:55D-68 preserves a property owner's right to maintain a nonconforming structure under such circumstances." Ibid. The majority responded that "the dissent reads our opinion too broadly .... [and] [o]ur holding today is very narrow and is fact sensitive." Id. at 59-60, 570 A.2d at 1017.
In Villari, the panel held that the evidence before the zoning board was sufficient to support the board's finding that *1215 the owner abandoned the nonconforming use of the property for raising pigs. Villari, supra, 277 N.J.Super. at 134, 649 A.2d at 100. The cessation of use was at least seven years, and perhaps as much as fifteen years, during which the owner used the property for a different purpose, growing crops, and did not maintain the fence that would be necessary for raising pigs. Id. at 133, 649 A.2d at 99. The owner provided no supporting evidence to substantiate his vague contention that market conditions were the reason for the cessation. Id. at 137, 649 A.2d at 101. The panel found the board's action sustainable under the traditional subjective abandonment test. Id. at 136, 649 A.2d at 101.
However, the panel went further, stating that "even if plaintiffs did not have an actual subjective intention to abandon the raising of pigs, we would sustain the Board's decision based on plaintiffs' prolonged cessation of that use." Id. at 137, 649 A.2d at 101. This was based upon "the objective discontinuance test advocated by Professor Williams and adopted by this court in Camara." Id. at 136, 649 A.2d at 101.
The test advocated by Professor Williams provides that "if nonconforming activities are not carried out in connection with a nonconforming use for a stated period of time, there is no legal right to resume." Ibid. (citing 4A Norman Williams, American Land Planning Law, § 115.4 at 205 (1986 rev.)(emphasis added)). This test has been adopted in a minority of states, and permits local zoning authorities to prescribe that if operations cease for a stated period of time (typically six months or one year), the nonconforming use right is automatically extinguished. See 6 Norman Williams, Jr. and John M. Taylor, American Land Planning Law, § 123:14 at 268-77 (2003 rev.).
Essential to utilization of this test is enabling legislation that authorizes local zoning authorities to establish a per se termination rule. In Villari, the panel cited as examples decisions from three states (including the Connecticut decision in Essex Leasing) adopting the approach: Hartley v. City of Colorado Springs, 764 P.2d 1216 (Colo.1988); Essex Leasing, supra, 206 Conn. 595, 539 A.2d 101; Canada's Tavern, Inc. v. Town of Glen Echo, 260 Md. 206, 271 A.2d 664 (1970). In each of those cases a local regulation provided for termination after nonuse for a stated period (six months or one year) and the state's highest court construed the enabling legislation as authorizing such local laws. We note that in 1989, one year after Essex Leasing was decided, the Connecticut legislature abrogated that holding by amending Conn. Gen.Stat. § 8-2(a) to expressly provide that local zoning regulations "shall not provide for the termination of any non-conforming use solely as a result of nonuse ... without regard to the intent of the property owner to maintain that use." See South Lyme Property Owners Ass'n, Inc. v. Town of Old Lyme, 121 F.Supp.2d 195, 208 (D.Conn.2000).
N.J.S.A. 40:55D-68 (and its predecessor, N.J.S.A. 40:55-48) have been consistently construed as allowing a property owner to indefinitely continue a nonconforming use. United Advertising Corp. v. Borough of Raritan, 11 N.J. 144, 152-53, 93 A.2d 362, 366-67 (1952); State v. Accera, 36 N.J.Super. 420, 423, 116 A.2d 203, 205 (App.Div.1955). In Accera, we expressly held invalid a one-year cessation of use ordinance as unauthorized by our State's enabling legislation, noting that "the very design of [the local ordinance] is to raise up an objective standard which would, after such a cessation, automatically put an end to the use in all situations without exception." Ibid. (emphasis added).
*1216 Thus the objective test advocated by Professor Williams and adopted in some states is not permissible in New Jersey under our well-settled jurisprudence. Under New Jersey's enabling legislation, a municipality cannot lawfully adopt an ordinance providing for automatic termination after nonuse for a stated period without regard to intent to abandon. See Williams & Taylor, supra, § 123:16 at 291-92 (stating that "[w]ithout explicitly adopting an objective test," Villari "commented favorably on the merits of such an approach"); William M. Cox, New Jersey Zoning and Land Use Administration, § 11-3 at 271-72 (Gann, 2004) (noting that Villari "does not, and probably could not, establish a time span in which the nonuse of a nonconforming use or structure will give rise to abandonment or to a presumption of intent to abandon," and urging "the legislature to establish a statutory presumption of intent to abandon in those cases where a nonconforming use has not been conducted over a specific period of time.")
We conclude, then, that neither Villari nor Camara adopted the kind of objective test advocated by Professor Williams. Neither of those cases dealt with an ordinance providing for termination after nonuse for a stated period. Nor is such an ordinance put forward as a basis for such an objective test in this case.[3] The test applied in Camara deemed a nonconforming structure abandoned by operation of law because of an event tantamount to total destruction. By its terms, the holding was narrowly limited to its facts. The vitality of the holding in Camara is further limited because another panel of this court considered precisely the same issue and adopted Camara's dissent, which the Supreme Court affirmed. Rogers v. Zoning Bd. of Adj. of Ridgewood, 309 N.J.Super. 630, 633-34, 707 A.2d 1090, 1092 (App.Div.1998), aff'd o.b., 158 N.J. 11, 726 A.2d 258 (1999).
We view as dictum Villari's alternative basis for sustaining the board's action under an "objective discontinuance test," Villari, supra, 277 N.J.Super. at 136, 649 A.2d at 101, based upon "a prolonged cessation" of the nonconforming use without regard to the owner's intent. Id. at 137, 649 A.2d at 101. The trial judge in this case relied on Villari's objective test as authority for upholding the Board's action based on S & S's cessation of operations for thirteen months, presumably deemed by the judge as "prolonged," without regard to S & S's actual intent. This was error.
Other courts have commented on Villari's discussion of an objective test. In Borough of Belmar v. 201 16th Ave., Belmar, 309 N.J.Super. 663, 674, 707 A.2d 1106, 1112 (Law Div.1997), the court noted, after discussing the objective test references in Camara and Villari, that "[t]he test for abandonment had thus become rather confusing." The court further expressed its view that any such confusion was put to rest by the "terse statement of the law" in the subsequently-decided case of Poulathas v. Atlantic City Zoning Bd. of Adj., 282 N.J.Super. 310, 313, 660 A.2d 7, 8 (App.Div.1995), that "[a]bandonment is a matter of intent." See also Fred McDowell, Inc. v. Bd. of Adj. of Wall, 334 N.J.Super. 201, 225, 757 A.2d 822, 835-36 (App.Div.2000) (the court did not reach the issue of abandonment of nonconforming *1217 use, but observed, citing Villari,"that the right to continue a prior nonconforming use may be lost not only through abandonment (which has been held to involve an intention to abandon the use) but also through cessation of the prior nonconforming use.").
We are convinced that N.J.S.A. 40:55D-68 does not authorize land use boards to deprive a nonconforming user of the right to resume the use after a temporary cessation without regard to whether the owner intended to abandon the use. The intent must be continuing and definite, and the owner bears the burden of proof by competent evidence. Such evidence was produced here. Certainly, a board can find a failure by the owner to meet the burden, notwithstanding an expression of intention to not abandon, based upon a fair evaluation of all relevant circumstances. The passage of time is one factor, and the longer the time of cessation the greater the weight attributable to that factor. But when the passage of time of nonuse is adequately explained by the owner, the subjective intent to resume the nonconforming use is continuing and definite and is substantiated as such by the owner's actions, there is no change or attempted change in use, and the character of the property is not changed, then the passage of time, whether or not deemed "prolonged," cannot deprive the owner of the right to the nonconforming use.
Reversed.
NOTES
[1] Permitted uses in the C-Commercial Zone include various retail and business uses, such as automobile repair and service stations, animal hospitals, commercial greenhouses and nurseries, groceries, food stores and bakeries, drugstores, restaurants, and the like. The zone also permits various service uses, such as dry cleaners, and office, professional, and public and institutional uses such as schools, private clubs and lodges.
[2] S & S alternatively applied for a use variance, which the Board denied. The Law Division affirmed the denial. S & S has not appealed that portion of the Law Division judgment.
[3] Stratford's ordinance provides that "If a nonconforming use of a building or land is voluntarily abandoned and ceases for a continuous period of six months or more, thereafter the subsequent use of such building or land shall be a conforming use...." (Emphasis added). The Board has consistently maintained that the ordinance requires traditional subjective abandonment plus six months cessation of use.