MAURER ET AL. *v.* SNYDER ET UX.

[No. 115, October Term, 1951.]

*Decided April 2, 1952.*

. The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Julius G. Maurer,* with whom was *John G. Rouse, Jr.,* on the brief, for the appellants.

*Emanuel Klawans* for the appellees.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing a bill for injunction against (*a*) alleged violations of the

Anne Arundel County zoning act and regulations there-under and (b) continuation of alleged nuisances.

Plaintiffs and defendants own adjoining properties at Magothy Beach, each fifty feet wide and running about 565 feet from the public road in the rear to the waterfront. Zoning regulations applicable to these properties were adopted on April 20, 1948 and again on February 15, 1949. These properties were zoned as "Cottage Residential". Of six zones provided for, the "Cottage Residential" is the highest, most restricted zone. In it "the following uses are permitted: Single or two-family dwellings.—Schools or churches.—Public buildings.—Home occupations and professional offices, providing that such an occupancy does not usurp a structure's primary use as a dwelling.—Accessory buildings to any of the above uses." A regulation provides, "Signs advertising professional offices or home occupations may not exceed two square feet in area." Defendants do not question the validity of the act or the regulations or claim any right to a non-conforming use.

The bill alleged that defendants "are engaged on [their] lot * * * in the business [a] of transporting for profit * * * fishing parties and (b) of selling for profit live crabs, peelers, soft crabs, minnows, fish and bait, all in * * * violation of said zoning act and the regulations * * * thereunder"; and also "that practically all of the numerous people who have become patrons of * * * defendants drive upon [defendants'] lot * * * in automobiles; that the roadway on * * * defendants' * * * property used by said patrons is not surfaced * * * and all of said automobiles stop, start, back and turn within approximately seven feet of the bedrooms in [plaintiffs'] house * * *; that the driving, stopping, starting, backing and turning of said automobiles produces not only clouds of dust but also fumes and gases which infiltrate the bedrooms and said home of [plaintiffs] to such an extent that they are denied the peaceful use and comfortable possession thereof"; and also "that * * * defendants employ in the operation of their said business two motor

launches, four row boats and a number of live boxes; * * * when defendants * * * made repairs to their said equipment, the discarded materials, consisting of boards with protruding nails and other refuse, was dumped overboard by them; * * * the bulk of said discarded material and refuse washed up on the beach of [plaintiffs'] lot * * *, and * * * it became necessary for [plaintiffs] to remove [it]; * * * since some of said refuse material has become submerged and is not discernible through ordinary inspection, the use of [plaintiffs'] bathing beach * * * has become hazardous and dangerous." The bill prayed an injunction against [a] use by defendants of their premises or any part thereof "for the sale of crabs, fish, bait and oysters or for any other commercial use, including the transportation of fishing parties, not permitted" by the Anne Arundel County zoning act and the regulations thereunder and [b] "continuing and perpetuating the nuisances described and set forth in the bill * * *." The answer denied "that defendants engage on said lot in the business of transporting fishing parties for profit, or selling for profit crabs, peelers, minnows, fish or bait" and alleged that "the people they have taken out on fishing parties have never paid them anything; * * * they do not fish commercially but only for sport, and with hook and line and not with nets, and only on a comparatively few occasions, when they made an excessive catch, did they dispose of the excess, not to the general public, but to neighbors, and not for market price but for a nominal sum". "They say that nobody comes to defendants' premises at any point near plaintiffs' premises other than defendants' friends and there is no space in which to park more than two cars, that nobody comes during the week, and only a few people on some week ends. * * * the so called 'customers' who come to defendants' premises do not drive by plaintiffs' premises at all, and park about two hundred feet from plaintiffs' home." Defendants deny throwing refuse overboard, say they have two small children who would be injured by doing so, and say that refuse of

which plaintiffs complain comes from plaintiffs' own wharf and live box. Mr. Snyder's testimony shows that some of these denials in the answer are not true, *e.g.*, denial that he "sold for profit crabs, peelers, minnows, fish or bait", and assertions that "the people he had taken out on fishing parties had never paid him anything" and that "only on a comparatively few occasions when he made an excessive catch, did he dispose of the excess, not to the general public but to neighbors, and not for the market price, but for a nominal sum."

Apart from zoning questions, plaintiffs' charges of nuisances call for little discussion. Strange to say, at the hearing and in this court the principal nuisance complained of was one not mentioned in the bill, viz., disturbance of sleep by noises from automobiles and other sources in connection with the arrival and departure of fishing parties at three or four o'clock in the morning. Most of the nuisance charges seem exaggerated and improbable on their face. All presented questions of fact. The trial judge, who saw and heard the witnesses, decided these questions of fact against plaintiffs. In so doing he was not clearly wrong; we think he was right. We shall only add that the instant case, both the charges and the facts, falls far short of *Fox v. Ewers*, 195 Md. 650, 75 A. 2d 357, in which trucks at the plaintiffs' bedroom window were held a nuisance, *Green v. Garrett*, 192 Md. 52, 63 A. 2d 326, the baseball case, or *Five Oaks Corporation v. Gathmann*, 190 Md. 348, 58 A. 2d 656, a restaurant case, in which latter cases noise and other annoyance caused by attracting a metropolitan or suburban crowd for amusement at hours when neighbors preferred to sleep, were held nuisances.

On the zoning questions defendants' contention, which was sustained by the court, is that their commercial maritime activities (if they are commercial), both the fishing parties and the sale of crabs, peelers and bait are "home occupations" permitted by the regulations. These questions are essentially questions of law as to the meaning of "home occupations". We must construe

this term and apply our construction to what defendants have done and are doing, regardless of the names they apply to their acts. Plaintiffs' witnesses, except their two brothers, one of them their counsel, were the defendant Mr. Snyder and friends or associates of his. The witnesses were not always candid—Judge Clark did not find them candid—but there are no important conflicts of testimony (except as to nuisance questions) other than some conflicts between what was first denied and later admitted. If defendants' activities are not clearly stated in the testimony of themselves and their friends and associates, they are readily inferrable therefrom.

Mr. Snyder's own position is two-fold, (1) he admits sales—and advertising signs which he could not deny—of "hard crabs", "peelers" and "bait", but minimizes the amount of such transactions, (2) he says he does not fish commercially, only for sport, and his fishing parties were confined to "friends".

Regarding his occupation and his fishing parties, Mr. Snyder testified, "Q. Mr. Snyder, what do you do? A. I forgot to mention I crabbed. I caught some crabs. Q. What do you do with the crabs? A. I ketch crabs whenever I can catch crabs. I don't always bring them home. I bring them home and put them in the live box. If anybody wants to buy any, I will sell them. Q. You do sell crabs? A. Occasionally when I have them. I don't always have them. I don't have any crabs now. Q. You do have signs advertising crabs, don't you? A. That's right. Q. You have one in the front of your property and one on the opposite end of the property? A. That's right. Q. What else do you do in your spare time? A. Well, I go fishing when the fish are biting. I fish with a hook. Q. With whom do you go fishing? A. Well I go fishing lots of times by myself; sometimes I go with my boy; sometimes I take my father; sometimes my father's friends; sometimes my friends; sometimes relatives' friends. Q. How often is that? A. Well this year I may have went, so far this season, I

may have went fishing ten or twelve times off-hand. * * * Q. What do you use that boat for, Mr. Synder: A. I use that boat for my own pleasure, fishing with a hook and line. Q. Do you take anybody with you when you go out? A. Yes. Sometimes I go by myself; sometimes I take somebody. Q. How often during the week do you go? A. Well it all depends. Sometimes I don't go any. I haven't went fishing for three weeks. Q. You were fishing quite often prior to that thought, wern't you? A. For two weeks this season, I fished. Q. How about June, did you have Mr. Collins out in June? A. I went fishing the last part of June I think. Q. When you go out, how many people do you take with you? A. Like I told you—sometimes I go myself, sometimes I take one, may take my boy, my father—(Court) Do any of them pay you any thing? (Witness) They chip in and pay me for my trouble, expenses and gas and all. (Court) That's what I want to know about—this chipping in business. How much do they chip in? (Witness) Well they chip in sometimes two dollars, sometimes five dollars. I have gotten as high as thirty dollars. When they catch a lot of fish, the fellows feel good. (Court) What is your charge? (Witness) I don't charge anything for my boat. Q. Isn't it true Mr. Snyder, that you charge ($5.00) Dollars a piece for people you take out. A. No, sir, absolutely not. Q. How do you determine your expenses then when you come in? A. I don't determine any expenses. A lot of fellows I take out for nothing, absolutely nothing. They don't pay me a penny. Q. How do they come to get to your place? A. Well, they are all friends of mine. Everyone that goes fishing. Q. What do you mean by friends—tell us who your friends are? A. Well, I have some friends, people that have known me ever since I was ten—twelve years old. They come down and go fishing with me." He then testified, in response to questions by the court, "Q. Well you would starve to death if you did it that way. You have a boat there. You have to make a living. A. I make a living. Q. You don't make a living with that

boat. A. No sir. Q. But you have to make a living somehow. A. Yes, sir. Q. Do you want me to understand that any time a friend comes along that you just get in your boat and stay out as long as he feels like staying. A. I stay as long as I want to stay, your Honor. Q. And you don't make him any charges at all? A. No sir. Q. Well how do you find time to make a living then? A. I make a living. I am a carpenter by trade. Q. Well how can you work at your trade when you are out on the river fishing? A. Well I go crabbing. I catch crabs. Q. Well nobody pays you for working at carpentry when you are out on the river doing that? A. No sir, but I still crab. I make money crabbing. I catch crabs and sell them. I never could make a living by taking what people offered me. If I depended on people just chipping in to pay me I would have starved to death." Previously he had found it difficult to say just what his occupation was. "Q. Are you employed now Mr. Snyder? A. Well I am always employed off and on. Q. Where? A. In all different places. I do all kinds of work. Q. Where? A. All different places. Q. Would you mind telling us some of the places? A. Well, I may go down the river a certain ways and repair a boat, or anybody who may want a boat repaired, I am a boat mechanic; I am a motor mechanic; I may fix a man's car; I am a carpenter; I am a boatbuilder; I work in a boatyard. Q. For whom did you work last week? A. Last week I was working for myself, drawing up plans to build three runabout boats. * * * Q. You are working on plans to build three runabouts? A. Drawing plans. Q. What do you propose to do with these runabouts? [Objection] (Court) Overruled. The question is, what he is getting at in an indirect way, is to show that this man hasn't got any regular job. A. One of them I am going to use and my boy's gonna use one, just for pleasure and running around the river, like I did before; I may use them myself for a season; then I will sell them if anybody would want to buy one. Q. So you propose to engage on that property in the building of boats? A. No. Well for these

boats, yes. * * * Q. Did you do any other work in 1951? A. Well I do so many little jobs, I can't remember where they are, the people's names. I am sort of a 'jack of all trades'. I know a lot of people and I may do a job and forget it tomorrow." Later he testified that he had taken out "I guess" twelve fishing parties in the 1951 season (before the trial, which began on August 16th) and "maybe" twenty-five in the 1950 season. He testified, "I never made any profit on it". Contrary to the averments of his answer, he testified that when he had a large catch of fish he did not sell it to neighbors, but took it to the market, that in 1951 he had sold about sixty cents worth of fish on the premises, about two hundred dollars worth off the premises, in 1950 about fifteen dollars worth on the premises.

There is no evidence that he advertised fishing parties. No one was identified as one of the "people that have known him ever since he was ten or twelve years old". It is a fair inference that anyone known to him as interested in fishing parties—and willing to "chip in and pay him for his trouble, expenses and gas and all"—was sufficiently qualified as a "friend" to go on such parties. Mrs. Snyder testified that "it takes a lot of money to maintain the boat and buy gas and he loves to fish and he is just tickled when somebody offers him money for gas". One of defendants' neighbors, who has gone on fishing parties with Mr. Snyder, testified, "Q. But you just live there and you have gone out to help Snyder catch fish so you can sell them in the morning? A. Yes. I wasn't paid like a regular fishing party; I just chipped in and helped pay expenses. Q. What do you mean by expenses. A. Gas, oil, beer, food. (Court) How much did you chip in? (Witness) One time two dollars; another time three. * * * Q. All those fellows go out and help catch fish in order to sell them at the market? A. Well we catch 300 fish, who's going to take them? I take home enough to eat and let Mr. Snyder have the rest." Mr. Snyder is not a "gentleman of leisure" able to live without working. It is evident that when he is

crabbing, or fishing, to the extent that he crabs and fishes, that is his occupation for the time being. Whether he calls it "fishing commercially" or "fishing for sport", and whether he calls his return "profit" or "payment for his *trouble* [*e.g.*, his time and earning capacity], expenses and gas and all", it is a commercial undertaking and what he gets is compensation for work at his occupation.

Mr. Snyder testified that he has five live boxes, three in the water and two smaller ones; they will hold altogether "maybe sixty dozen"; he usually has about fifty to sixty dozen crabs. Ninety-five per cent of the people who come to buy crabs come in row boats. Sometimes he sells fish by the pound, sometimes by what he thinks they weigh. He has two scales; when people come in to buy fish, he uses either scale; the customers want to know just how much money to give him. At the end of Mr. Snyder's testimony, Judge Clarke remarked, "It is not my fault if he has been vague."

Mrs. Snyder testified that most of defendants' business is on weekends; "we very seldom have anybody during the week because people mostly come on weekends to get crabs. * * * they come in rowboats; lots of people from the neighborhood come and then we have a few cars come down". They sell each week "I guess about fifty dozen"; they get seventy-five cents a dozen. Around Fourth of July we sell a lot of [fish], more than usual. * * * we sell right smart of peelers."

Assuming that in zoning, as in other fields of law, the principle *de minimis* has a place, we find no place for it in the instant case. During the crabbing and fishing seasons defendants were engaged in commercial business to a substantial extent. What the net proceeds were, whether or not they considered the business a success, is not shown and is not material.

In a careful, well-reasoned opinion, based largely on analogy to *Osborne v. Talbot*, 197 Md. 105, 78 A. 2d 205, Judge Clark held that defendants' activities constitute a "home occupation" permitted by the zoning regulations. To a large extent we concur in his reasoning, but we

reach a different conclusion, (*a*) by putting more stress on the difference between *Osborne v. Talbot* and the instant case, and (*b*) by construing "home occupation" less broadly. *Osborne v. Talbot* involved the effect of a restrictive covenant in a 1910 deed upon the use by a chiropractor of his residence. In the professional aspect, a chiropractor is not a physician (*Crider v. Cullen,* 191 Md. 723, 63 A. 2d 618), but in the real estate aspect the positions of a chiropractor and a physician are analogous. From time immemorial, and to a considerable extent today, the profession of a physician, especially of a "country doctor", has been a typical illustration of a "home occupation". Unless this were true, a community such as Magothy Beach could never have a resident practising physician. In this respect we see no near analogy between a physician and a "waterman". Furthermore, in suggesting that the scope of "residence purposes only" may be a matter of degree, we were referring not to the monetary volume of a business done but to the degree of changes in the structure or use of the building.

On the meaning of "home occupation" Judge Clark said, "A 'home occupation', however, must be something which is customarily incident to the use of the premises as a dwelling. In some communities, the sale of crabs, fish, bait, and the taking out of fishing parties, would not come within this category, but, in a community where there are hundreds of houses fronting on the water, and many men doing exactly what Mr. Snyder is doing, and from their homes, I think what he is doing must be denominated as a 'home occupation'. Drive around any waterfront in Anne Arundel County, and you will see numerous signs up on properties which are primarily residential, indicating that fish, crabs, bait and so forth are for sale there. And, if the driver will go one step further, and investigate, he will find, in most instances, that a waterman lives in the house in question, a waterman who makes his living catching fish, crabs, oysters and so forth, selling most of his catch on the wholesale market, but a small part thereof at

his home. Mr. Snyder is in the business on a rather small scale, and, at this time, I cannot see that his activities are so extensive that they can be said to 'usurp' his home's 'primary use as a dwelling'. If he should increase his activities to any considerable extent, we might have a different story. It is all a question of degree."

We think this construction is too broad. The names Billingsgate and (in its collateral connotations) Marsh Market Place are reminders that the sale of fish has no necessary relation to "home" life in a "cottage residence" community. The activities, lawful or unlawful, of "watermen" in "Our Mutual Friend" were not "home occupations" incidental to the use of their "homes", as such, at or near the river. The occupation of a "waterman", *per se*, is no more a "home occupation" than the occupation of a farmer or a garage keeper—or, formerly, "the village blacksmith". If defendants' occupations were in the past not uncommon in Anne Arundel County, the question remains whether they now are permitted in a "cottage residential" zone. We think not.

If an owner wishes to use her residence as a beauty parlor (*Dobres v. Schwartzman*, 191 Md. 19, 59 A. 2d 684) or a funeral parlor (*Ullrich v. State*, 186 Md. 353, 46 A. 2d 637, 165 A. L. R. 1107) the properties so used are none the less a beauty parlor or a funeral parlor, because also used as a residence, and within express prohibition of such uses in a residential district. In *Dobres v. Schwartzman* we held it unnecessary to decide whether a beauty parlor is a home occupation permitted by one section of the zoning ordinance in view of express prohibition of beauty parlors by another section. In *Piper v. Moore*, 163 Kans. 565, 183 P. 2d 965, a use in question was held not to be permitted as a "home occupation" and also to be prohibited as a "public garage", as defined for zoning purposes. It has been held that a dancing school, operated on a large scale, after structural changes in the building (*State ex rel.*

*Kaegel v. Holekamp,* Mo. App., 151 S. W. 2d 685, quoted by Judge Clark) or a restaurant, which apparently had a cook of some local reputation in the vicinity, who was a sister of the owner and lived in the house, (*King County v. Lunn,* 32 Wash. 2d 116, 200 P. 2d 981) or a real estate brokerage office (*Village of Riverside v. Kuhne,* 335 Ill. App. 547, 82 N. E. 2d 500) was not a "home occupation". In construing "home occupation" we see no difference, in principle, between a general prohibition of commercial uses and a specific prohibition of a beauty parlor, a funeral parlor, or a "public garage".

The *proviso* in the regulation relating to "home occupation" does not broaden but narrows the definition of "home occupation". It does not include as a "home occupation" any commercial enterprise which can be conducted on a lot 565 feet deep without "usurping" the primary use of the dwelling. If it could be so construed, the residential character of a "cottage residence" district would have little meaning or legal protection.

> *Decree reversed with costs, and cause*
> *remanded for passage of a decree in*
> *accordance with this opinion.*