108 N.J. Super. 6 (1969)
259 A.2d 727
THE BOROUGH OF SADDLE RIVER, A MUNICIPAL CORPORATION OF NEW JERSEY; EX REL: LOUIS H. PERRIN, BUILDING INSPECTOR AND ZONING OFFICER, PLAINTIFFS,
v.
JOHN A. BOBINSKI, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided December 5, 1969.
*7 Messrs. Evans, Hand, Allabough and Amoresano, attorneys for plaintiffs (Mr. Peter Vandervoort appearing).
Mr. Lester H. Fox, attorney for defendant.
*8 LORA, J.S.C.
This is an action for permanent injunction against the use of a structure located on defendant's premises for the stabling of horses. Plaintiff contends that such use is in contravention of the terms and provisions of the zoning ordinance of the Borough of Saddle River. Defendant, on the other hand, contends that such use is permissible as a nonconforming use.
The building in question, which is on defendant's 9-10-acre plot, is a barn situated approximately 5 feet from the easterly boundary line of said property, 240 feet from the house of the nearest neighbor and 400 feet back from the public road. It is 35 feet high, 66 feet wide and has a shed attached to the rear, the combined buildings being 65 feet deep.
The premises were purchased by defendant John Bobinski from Karl and Jane Manz in October 1967, in response to a newspaper advertisement that featured "a fine barn for stable horses."
Manz had acquired the property in 1916 and resided there with his wife and children for 41 years until the sale in 1967. In the earlier years Manz put the premises to farming use, raising certain crops and berries and as many as 1,700 chickens whose eggs he sold to a Paterson market. He kept a cow and seven or eight farm horses, stabling five in the barn's stalls and two or three in the attached shed along with related farm equipment.
Gradually, Manz cut down on his farming and, due to the consequential lack of need, disposed of the horses, the last one in 1940. From that time on the premises were not used for commercial farming although Manz, who took a position in the post office, continued to spray and care for many apple trees and maintained a small half-acre garden for family use. The barn structure was not put to use for any purpose during the period 1940 to 1967, and no horses or other animals were stalled therein. Nevertheless, he continued to spend money on the structure by painting it and *9 keeping it in otherwise good shape and repair so that the barn was "exactly the same when sold" to defendant.
The court finds that despite the lack of use of the barn-stable for 27 years, the Manzes had no affirmative subjective intent to abandon the use of the structure for stabling horses. On the contrary, they often discussed the purchase of a horse for their daughter, albeit such purchase was repeatedly postponed because of her unwillingness to commit herself to take proper care of the animal. A real estate broker's inquiry as to whether they were interested in stabling four horses for a time was rejected only because it would be too much trouble for them.
Then, too, the Manzes always thought they could keep horses in the barn at any time they decided to resume doing so; that they had the right to keep horses there any time they wanted to, and they never intended to give up that right. As a matter of fact, long before 1940 when Manz began some mechanizing of his farm operations, he built a separate garage for his motor vehicles and motorized farm equipment rather than use or convert the barn for such storage. Pursuant to such understanding and intent, they represented to defendant that he would be able to keep nine horses in the stable and shed structure in accordance with the borough ordinance which permitted keeping one horse per acre.
It is clear that defendant purchased the property solely because of the barn and the anticipated use thereof for stabling his show horses and trotters and pacers.
Effective January 1, 1963 plaintiff borough adopted a codification of ordinances and effective August 7, 1965 adopted ordinance No. 134, so that in October 1967, when defendant acquired this property, classified as R-1, residential, horses were permitted to be maintained on such property provided the number did not exceed one horse per acre and they were housed in a structure not exceeding 20 feet in height and located at least 85 feet from any property line.
Section 8:11-1(v) of the ordinance reads that "it shall be prima facie evidence that a nonconforming use has been *10 abandoned when there has been a cessation of the exercise of such nonconforming use for a period of one (1) year," and thus creates a presumption of abandonment of a nonconforming use after a one-year lapse without such use.
Shortly after acquisition defendant made some repairs and commenced using the barn to stable horses. Plaintiff contends this is in contravention of the borough's zoning laws since the barn is less than 85 feet from any property line. Upon notification, defendant did not seek a building permit or a variance but merely ceased the repair of the structure and continued to use it as a stable.
A municipal court complaint was filed and on August 1, 1968 the judge of that court found defendant not guilty on the ground that the nonconforming use as a stable was a preexisting nonconforming use, which use had not been abandoned. However, a fine was imposed for failure to apply for a building permit prior to commencing repair work.
Defendant contends the disposition in the municipal court constitutes res judicata and, in any event, that the use of the stable is protected by N.J.S.A. 40:55-48 as a preexisting nonconforming use which has never been abandoned. It is plaintiff's position that a municipal court acquittal of a charge of violating a zoning ordinance is not a bar to a civil action seeking an injunction against the violation of the same ordinance; that noncomforming uses not in actual use at the time of the effective date of a zoning ordinance are violations of that law and may not be continued, and that the failure to employ the structure as a barn-stable for a period of 25 years constitutes an abandonment of such use  that some affirmative action is required to preserve a nonconforming use, not just an intent to preserve the right to so use the property.
It has been held in New Jersey that a municipal court action charging an ordinance violation is, procedurally at least, and within the intendment of the rules providing for appeals from judgments of conviction in the inferior courts of limited jurisdiction to County Court, essentially *11 criminal in nature, irrespective of whether the penal section of the ordinance provides for a fine only or for both fine and imprisonment, and even though such violation does not constitute an indictable offense. State v. Yaccarino, 3 N.J. 291, 295 (1949); Newark v. Pulverman, 12 N.J. 105, 114 (1953). The doctrine of res judicata bars a subsequent suit between the same parties and involving the same cause of action. Nevertheless, the application of this doctrine is analyzed as follows in Moore, Federal Practice, § 0.418(1), at 2703:
The generally accepted rule is that, because a defendant is surrounded by greater safeguards in criminal than in civil litigation, and the standard of proof to which the complainant is held is higher, a judgment of conviction is conclusive in civil litigation between the same parties as to issues that were litigated and adjudicated in the criminal prosecution. But as to a judgment of acquittal this same difference in standards of proof has led to the rule that an acquittal concludes no issues as to civil liability in favor of the acquitted defendant. The theory underlying this rule is that the proof offered by the prosecution in a criminal case, although insufficient to prove guilt beyond a reasonable doubt, and thus support a conviction, might well be sufficient to support a judgment of civil liability.
See also 18 A.L.R.2d 1315 (1951).
This rule has been applied by the United States Supreme Court in Helvering v. Mitchell, 303 U.S. 391, 397, 58 S.Ct. 630, 82 L.Ed. 917 (1938), in which an acquittal of a charge of income tax evasion was held not to bar a subsequent action to recover an added assessment for income tax deficiency. Likewise, in United States v. United States Gypsum Co., 51 F. Supp. 613 (D.D.C. 1943), an acquittal of a charge of conspiracy to monopolize was held not to be res judicata in a subsequent action by the Government to enjoin the alleged monopolistic practices.
An interesting New Jersey case discussing these problems is State v. La Bella, 88 N.J. Super. 330 (Cty. Ct. 1965) which involved an action to return money seized by law enforcement authorities in connection with a gambling arrest *12 subsequent to an acquittal on the gambling charge. There it was held that the previous acquittal barred relitigation of the question of the existence of the gambling operation in the subsequent action wherein the State sought to rely on the statutory provisions for forfeiture of the seized monies. Judge Conklin distinguished Helvering, supra, relying on Coffey v. United States, 116 U.S. 436, 6 S.Ct. 437, 29 L.Ed. 684 (1886), and Mitchell v. Commissioner of Internal Revenue, 89 F.2d 873 (2 Cir. 1937), citing the following language in Mitchell:
The only rule necessarily derivable from Coffey v. United States would seem to be that an acquittal in a criminal prosecution is a bar to a civil action to enforce fines or forfeitures of property which are in their nature criminal penalties. Though this rule seems hard to justify in view of the different degrees of proof required in order to establish criminal guilt and civil responsibility, it is implicit in the decision of Coffey v. United States which is binding on us in the absence of a modification by the Supreme Court.
The Court in La Bella (at 340 of 88 N.J. Super.) found such reasoning to be conclusive in view of the quasi-criminal nature of a forfeiture proceeding, "since it is intimately related to certain criminal activity" which had already been resolved in the prior criminal action. This rationale does not extend to the case at bar, however, where the first action was criminal or at least quasi-criminal in nature, and the second action is a purely civil suit to enjoin the use of the structure as a horse stable. Under such circumstances this court concludes that United States Gypsum, supra, is directly applicable, and the municipal court acquittal of the zoning violation charge does not act as res judicata barring this action for an injunction.
N.J.S.A. 40:55-48 provides that: "Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the building so occupied and any such structure may be restored or repaired in the event of partial destruction thereof." And *13 section 8:11-1 of the zoning ordinance reads: "Any lawful, nonconforming use which existed at the effective date of this Chapter may be continued * * *."
Actual use of the structure as a stable did not resume until almost five years after passage of the 1963 ordinance and two years after ordinance No. 134, when defendant purchaser in October 1967 began to stable his horses therein. Hence, plaintiff argues there was not a conforming use in existence at the time the ordinance became effective, and the question of abandonment is irrelevant; that mere intention to make nonconforming use of property is insufficient and that it is the use in fact existing and occupying the land at the time of the adoption of a new zoning ordinance that may be continued contrary to any new regulations. State v. Accera, 36 N.J. Super. 420 (App. Div. 1955); Martin v. Cestone, 33 N.J. Super. 267, 269 (App. Div. 1954), Ardolino v. Florham Park Board of Adjustment, 24 N.J. 94, 104 (1957). Plaintiff further states that no use may be deemed a nonconforming use under the Statute unless such use or purpose was actively being pursued at the time the zoning ordinance was passed.
In Weber v. Pieretti, 72 N.J. Super. 184, 198 (Ch. Div. 1962), aff'd 77 N.J. Super. 423 (App. Div. 1962), the trial court, in considering Martin, referred to Chayt v. Board of Zoning Appeals, 177 Md. 426, 9 A.2d 747 (Ct. App. 1939). As in Weber and in Chayt, the ordinance here provides in section 8:3-1 (d), "The word `used' shall be deemed also to include `designed, intended, or arranged to be used.'"
The court in Weber found it unnecessary to restrict itself to an interpretation of N.J.S.A. 40:55-48, and based its decision on the municipal ordinance instead, noting that
[W]hile the municipality cannot limit by zoning ordinance the statutory right afforded the owner to continue a nonconforming use * * * it may by zoning ordinance be more liberally disposed toward nonconforming uses than R.S. 40:55-48. [72 N.J. Super. at 198].
*14 The court further said:
In construing the meaning of this definition, the court in Chayt ruled out any contemplated use as within the ordinance and limited it to existent structures that may be so designed or arranged for the particular use. It further said that by including the words `arranged, intended or designed to be used' provision is made for allowing the suspension of an actual use and that `[I]t would be unlikely that a zoning ordinance would make provision for so unsubstantial a thing as a plan in mind. * * * The law would not be concerned to regulate a charge of intention.' [Ibid.]
The Maryland Court of Appeals concluded:
Where a property is built for or adapted to a particular use, the question of existing use is determined by ascertaining as near as possible the intention of the owner, in connection with the fact of a discontinuance or apparent abandonment of use; it is not to be determined on the date of the adoption of the ordinance. Appeal of Haller Baking Co., 295 Pa. 257, 262, 145 A. 77, 79. [9A.2d, at 750]
Application of this doctrine to the facts herein, where there had been a suspension of an actual use rather than a mere intention of future use, leads this court to conclude that there was an existing use within the comprehension of the ordinance when it became effective.
Reliance on the terms of the municipal ordinance suffices to distinguish the present case from State v. Casper, 5 N.J. Super. 150 (App. Div. 1949), where the court based its decision on an interpretation of the state statute itself. However, it is not clear from Casper that reliance on the statute would require a contrary result herein. Casper was convicted of violating a zoning ordinance by permitting a house to be used as an apartment house where it had formerly been used as a rooming house and had been closed for four years after the operator died and after all roomers had been asked to leave. The Appellate Division, with one judge dissenting stated:
The non-conforming use must be a continuance of the same use made of the property at the time of the passage of the ordinance; it *15 must have been lawful when instituted and actively and constantly maintained. [at 153].
While the court pointed out that there was no evidence of any effort made to continue the business or to find a tenant, it also stated, "Nor does it appear that it was sold as a rooming house as in Eilenberg v. Taggart, 119 N.J.L. 61. The present use is different from the use made of the property by Gaffney. He entertained roomers and paying guests. Mrs. Casper has three apartments there which she has rented out. Such a change or enlargement of the use is fatal to its continuance." There, too, the use as a rooming house had not been legally instituted since it had been conducted without a license.
In the context of Casper it would appear that the statement requiring a nonconforming use to be in existence at the time of the passage of the ordinance and "actively and constantly maintained" could be construed to permit continuance of a preexisting valid use which had not been abandoned in law, even though its active pursuit was suspended prior to the time the ordinance was passed, so long as the structure continued to be "actively and constantly maintained" without change to some other use.
Under the facts of the present case, for example, the active use of the barn structure as a stable was suspended prior to and at the time of passage of the ordinance, but there continued to be some active maintenance of the structure. Repair of a structure has been held to show an intention to continue rather than to abandon a nonconforming use. 2 Yokley, Zoning Law and Practice (3d ed. 1965), § 16-13, at 275; Brown v. Gerhardt, 5 Ill.2d 106, 125 N.E.2d 53 (Sup. Ct. 1955); Board of Zoning Adjustment v. Boykin, 92 So.2d 906 (Ala. Sup. Ct. 1957).
While it is the policy of New Jersey law to restrict rather than encourage nonconforming uses, Weber, supra, at 195 of 72 N.J. Super., that case clearly holds that a more *16 liberal treatment of nonconforming uses under a municipal ordinance is to be given effect.
At trial it was emphasized by plaintiff that no attempt was being made to have defendant discontinue the keeping of horses on his property, section 8:5-7 of the ordinance permitting one horse per acre, but only to prevent the use of the existing barn structure for the stabling of horses due to the fact the stable was less than the 85 feet from the property line, as required by section 8:5-11(a).
However, section 8:11-1, entitled "Continuation of Non-conforming Use and Structure," provides in subsection (b), "Nonconforming Buildings":
Any building or structure which (1) existed at the effective date of this Chapter, (2) was nonconforming on such date by reason of its design, its placement on a conforming lot or its location on a nonconforming lot and (3) constituted an otherwise conforming use, may be continued.
It may be said that this section of the ordinance further affirms defendant's right to stable horses in the barn and attached shed. See In re Yocum, 393 Pa. 148, 141 A.2d 601, 605 (Sup. Ct. 1958), which distinguishes between a nonconforming general use and the use of a building whose juxtaposition on the land renders it nonconforming.
The remaining issue to be determined is whether the circumstances in this case establish that the earlier nonconforming use was abandoned. It is well settled in New Jersey and elsewhere that the actual abandonment of a nonconforming use is fatal to its continuance. See e.g., Montclair v. Bryan, 16 N.J. Super. 535 (Cty. Ct. 1951), where it was held that a structure once used as a multi-family dwelling and subsequently used as a single-family residence for 27 years, could not then be restored to its original nonconforming use..
It has frequently been stated that abandonment of a nonconforming use depends upon the concurrence of two *17 factors: one, an intention to abandon; and two, some overt act, or some failure to act, which carries a sufficient implication "that the owner neither claims nor retains any interest in the subject matter of the abandonment". Yokley, op. cit., § 16-13, at 273-274.
Mere discontinuance, or the passing of time, is not sufficient to constitute an abandonment, Haulenbeek v. Allenhurst, 136 N.J.L. 557 (E. & A. 1948); Marino v. Mayor, etc. of Norwood, 77 N.J. Super. 587, 590 (Law Div. 1963); State v. Accera, 36 N.J. Super. 420, 424 (App. Div. 1955), although it has been noted in other jurisdictions that the period of time of nonuse may be of some evidentiary value, "especially in connection with facts showing an intent to discontinue use". Pioneer Insulation and Modernizing Corp. v. Lynn, 331 Mass. 560, 120 N.E.2d 913 (Sup. Jud. Ct. 1954).
In Wood v. District of Columbia, 39 A.2d 67 (Mun. Ct. App. D.C. 1944), a structure, built and equipped as a stable, had been used as such for more than 40 years. The property had then been vacant for about six years and had been advertised for rent as a stable. The court pointed out that lapse of time may only be considered as one element in determining whether a nonconforming use is abandoned; the fact that the building was retained so that its use was limited to the stabling of horses during the extended period of vacancy, and that it was being advertised for lease as a stable, showed plainly that it was not intended to abandon its nonconforming use.
The issue in Haulenbeek, supra, was whether a structure could be used as a hotel on the theory of nonconforming use, despite the fact that it had not been so used for several years. The court upheld the hotel's standing as a nonconforming use notwithstanding the period of nonuse. Nonetheless, it might be argued that Haulenbeek is distinguishable in that there the nonuse was caused by factors outside the control of the property owner: "lack of demand, inability to get a tenant and financial difficulty," 136 N.J.L., at 559. However, *18 it must again be emphasized that the primary question is the intent of the owner as determined from his actions. Such intent must be determined on a case-by-case basis.
Manz never intended to abandon; on the contrary, he kept and maintained the barn in a good state of repair for the day he would resume the stabling of horses therein, and, most significantly, he never made any different use whatsoever of the barn. Cf. Beyer v. Mayor, etc., of Baltimore City, 182 Md. 444, 34 A.2d 765, 768, 769 (Md. Ct. App. 1943), where it was held that an owner of property which had been used as a slaughter house, who disposed of all its machinery, altered the structure by taking down the smokestack and used the property for storage purposes, and who had only the vaguest sort of an intention of resuming the slaughter house business at some future day if conditions should improve, had abandoned the nonconforming use.
The prior use of the structure as a stable, together with its continued maintenance and repair by Manz over the years, without any alteration in its adaptability to continue use as a stable or any contrary use during that interim period, established that there was no abandonment under the circumstances.
Saddle River's ordinance contains a provision which makes the showing of mere nonuse for a period of one year prima facie evidence of abandonment. In State v. Accera, 36 N.J. Super. 420 (App. Div. 1955), an ordinance which provided nonuse for a one-year period barred resumption of a prior nonconforming use was held to be invalid as contrary to the intent of the New Jersey statute authorizing indefinite continuance of a nonconforming use. However, the holding in Accera does not necessarily invalidate the subject ordinance provision which merely relieves plaintiff of the burden of producing evidence of abandonment and requires defendant to come forward with evidence of the lack of abandonment. As already noted, defendant has met this burden and has established that there was no abandonment of the nonconforming use.
*19 In view of all of the foregoing, the court concludes that defendant is entitled to continue the nonconforming use of the barn structure in question for the stabling of horses. Accordingly, judgment will be entered in favor of defendant and against plaintiff, dismissing the complaint.