707 A.2d 1106

BOROUGH OF BELMAR, AND BOROUGH OF BELMAR AS OWNER IN FEE OF 201 AND 203 16TH AVENUE, BELMAR, NEW JERSEY, PLAINTIFFS, v. 201 16TH AVENUE, BELMAR, NEW JERSEY; WASHINGTON FINANCIAL CORP.; 203 16TH AVE- NUE, BELMAR, NEW JERSEY AND NATIONAL LOAN INVES- TORS, DEFENDANTS.

Superior Court of New Jersey
Law Division
Monmouth County

Decided August 14, 1997.

664

*Karl P. Kemm,* for plaintiff (*Lynch, Martin, Philibosian, Chansky, Fitzgerald & Kane,* attorneys).

*Susan P. Anderson,* for Washington Financial Corp. (*Budd, Larner, Gross, Rosenbaum, Greenberg & Sade,* attorneys).

*Linda S. Reinheimer,* for National Loan Investors (*Reinheimer & Krug,* attorneys).

McGANN, J.S.C., retired and temporarily assigned on recall.

Where a bank lends money for the purchase of commercial property, which derives its value as a rooming house permitted as a nonconforming use in a residential zone, after abandonment of that use by the owner, does the mortgagee bank nonetheless possess an independent right to assert that the purchaser at the bank's foreclosure sale takes title with the benefit of this valid nonconforming use status? That is the question posed here. There appears to have been no prior judicial ruling on that issue.

The essential facts are not in dispute. The matter was presented to the court by way of a summary hearing pursuant to *R.* 4:67–5.

On May 10, 1988 Raymond Hargadon purchased property known as 201–16th Avenue in Belmar designated on the Tax Map as Block 161, Lot 1 (hereinafter "Lot 1"). He did so by borrowing $150,000 from the Morsemere Federal Savings Bank. In return for the loan he gave the bank his note and a purchase money mortgage on the property. The mortgage was duly recorded. About a year later, on June 15, 1989 Hargadon purchased the adjoining property known as 203–16th Avenue, Block 161, Lot 2 (hereinafter "Lot 2"). That purchase, too, was funded by a $180,000 loan made by Morsemere Federal Savings Bank secured by a purchase money mortgage, also duly recorded. Each of the lots had a depth of 67.11 feet. Lot 1, a corner lot, had a frontage of 28.50 feet on 16th Avenue; Lot 2's frontage was 31.50 feet. Each lot was substantially covered by a three story frame rooming

house containing 18 separate accommodations. The photographs show very similar structures of pre-World War II vintage.

16th Avenue runs parallel to and one block west of Ocean Avenue. The structures had been designated and built as rooming houses for summer rental. They had been used for that purpose long prior to Hargadon's purchases and were used by him for the purpose through the summer of 1990. The properties are presently zoned for single family residential use. The borough concedes that when Hargadon purchased them, both properties had the benefit of a valid, nonconforming, rooming house use, as well as the status of nonconforming structures.

Metrobank Federal Savings & Loan Association acquired the Morsemere Federal Savings Bank and with it both notes and mortgages.

On September 14, 1990 Hargadon defaulted in making his payments on the Lot 2 note and mortgage. On May 15, 1991 he defaulted on his payments on the Lot 1 note and mortgage. He filed a Chapter 7 petition in bankruptcy on August 23, 1991. His discharge was entered on July 8, 1992, at which time his personal liability for each of the debts was terminated. The 1990 summer season was the last time either property was used as a rooming house. Both structures have been boarded up since 1991.

On April 10, 1992, the Resolution Trust Corporation (hereinafter "RTC") was appointed receiver for Morsemere Federal Savings and Loan. On February 16, 1996 the FDIC as successor to the RTC sold the note and assigned the mortgage on Lot 1 to Washington Financial Corporation, a corporation of the State of Washington. The assignment was recorded on April 26, 1996.

As to the note and mortgage on Lot 2, the RTC assigned those assets to the RTC Mortgage Trust 1994–N2 which in turn assigned them to State Street Bank and Trust Company, which in turn assigned them to National Loan Investors, L.P. That last assignment was duly recorded on September 17, 1996.

Meanwhile, in October 1992, Vincent Gifford, an experienced investor in Tax Sales Certificates, bought tax liens from the borough on both Lots 1 and 2 for the years 1990 and 1991. He had viewed the properties before doing so but did not conduct a title search until December of 1994 (at a time when the liens were ripe for foreclosure). He located Hargadon (then living in Nyack, N.Y.) on June 23, 1995 and obtained a quitclaim deed for both properties from him for nominal consideration. Title was taken in the name of T.L. Properties Inc. (wholly owned by Gifford). That deed was duly recorded on July 8, 1995.

Discussions between Gifford and the Mayor and Clerk of Belmar then took place. The borough had a legitimate interest in eliminating this particular nonconforming use, which had the potential for 36 additional summer rentals in a town overburdened by local problems which such uses create. Gifford was willing to cooperate in achieving that result for a modest profit on his total investment. Since he, personally, held the tax sale certificates and fee title in the name of his corporation, he suggested that a Tax Sale Certificate foreclosure might eliminate the mortgage liens on the property and effectively clear the title. He reasoned that the two mortgage holders who had never evidenced any interest in the properties might well decide not to redeem the tax sale certificates. He agreed to pursue the foreclosure of the tax sale certificates and filed the necessary complaints. However, in each case when the complaints were served on the mortgagees, they redeemed the tax sale certificates and those complaints were dismissed; the tax sale certificates were discharged.

Title thus remained in T.L. Properties subject to the lien of the two mortgages.

Further discussions between Gifford and borough officials led to a deed dated February 22, 1997 from T.L. Properties to the borough for Lots 1 and 2. The stated consideration is $10,000. It is made expressly subject to the mortgages held by Washington Financial Corp. and National Loan Investors. At the insistence of

the borough officials the following language was included in the deed:

> Grantor acknowledges that it has abandoned the use of the property as a rooming house and that the two tracts have been utilized as a single consolidated lot.

However, prior to that deed, foreclosures of both mortgages had commenced. On September 26, 1995, RTC Mortgage Trust 1994–N2 instituted a foreclosure action against Hargadon and T.L. Properties on Lot 2 under docket number F–12449–95. A notice of lis pendens was filed on October 12, 1995. Thereafter, as noted above, that entity assigned the mortgage to State Street Bank which then assigned it to National Investors Company. The last assignment was recorded on September 17, 1996.

On July 15, 1996 (shortly after taking and recording on April 26, 1996 the assignment of the Lot 1 mortgage from the RTC), Washington Financial Corp. filed its complaint in foreclosure against Hargadon and T.L. Properties Inc. under docket number F–9289–96. The notice of lis pendens in that case was filed on July 29, 1996.

The T.L. Properties deed came to the attention of the mortgagees immediately on its delivery to the borough. Washington Financial acted promptly; and on notice to the borough by way of an order to show cause, on February 27, 1997, the court entered an order in the foreclosure actions restraining recording of the deed. The two mortgage foreclosure cases were then consolidated. The injunctive order has been continued pendente lite.

Belmar then brought this action seeking a declaration that:

1) the nonconforming rooming house use no longer exists, and

2) by virtue of the T.L. Properties deed, there had been a merger of Lots 1 and 2 onto one large lot—with two separate boarding house structures on it.[1]

---

[1] The last clause of the sentence was ruled a nullity on motion for summary judgment brought by each of the mortgagees. The first clause is the issue to be decided here in the context of the foreclosing mortgagees' rights.

A summary hearing was accordingly scheduled; briefs were submitted; arguments heard. At the conclusion of the hearing and based on those uncontested facts, the court made the following initial findings and reserved decision on the abandonment issue as it may affect the rights of the mortgagees:

1. The former owner, Hargadon, did not attempt to operate the properties in the summer of 1991. Based on that state of his finances he could not. Instead he resorted to his bankruptcy rights to be discharged of the debts and abandoned the properties to the foreclosure actions on his defaults under the mortgages (as well as to potential foreclosure of the tax title certificates). He, certainly, abandoned any interest of his in the property, including his right as owner of the fee to argue the continued vitality of the nonconforming rooming house use. His giving of the quitclaim deed to T.L. Properties did not attempt to transfer that right, but rather emphasized its abandonment by him.

2. The abandonment language in the deed from T.L. Properties to the borough changed nothing. It was just a conduit, of whatever it had received from Hargadon, to the borough. It received nothing but bare legal title from Hargadon and did not seek a certificate of continued existence of the nonconforming use from the borough. Conversely, the statement in its deed that it was abandoning what it never had, is therefore, meaningless.

3. There is no doubt that at the time the loans were made by Morsemere on each of the properties, it relied on the commercial nature of the properties, including a valid nonconforming use as security for the loan.

At the present time, final judgments in foreclosure on each of the properties have been entered; writs of execution have been issued to the Sheriff and sales of each property have been advertised and scheduled.[2] As to Washington Financial Corp., its final judgment established the amount due to it on its lien as

---

[2] Pending this opinion those sales have been adjourned by court order to specified dates in the near future.

$271,949.46. The final judgment for National Investors fixes the amount due on its lien as $340,681.40 plus costs. The only question here is what may be announced to prospective bidders at the sheriff's sales. The mortgagees seek a court declaration that the successful bidder will take title through the sheriff's deed which will include a valid nonconforming rooming house use. Belmar wants to be able to state at the sale that there is no existing nonconforming use; that the court has declared it was abandoned. The difference hypothetically, will affect the amount a willing bidder may be willing to pay.

Without advancing any further funds (except sheriff's fees) Washington National can bid as high as $272,000 and National Investors, $341,000. If indeed the borough wishes to demolish the structures and sell the individual lots as single home residential sites (or combined, as one home site) its bid topping the amounts owed on the liens would seem a rash and imprudent expenditure of municipal funds.

It is fair to assume, then, that the mortgagees will probably be the successful bidders at the sale. If there is a declaration that the nonconforming use has not been abandoned, then each could advertise the property and the building thereon, for sale as a rooming house for commercial use—that to being their best chance of maximizing their respective returns.

## LEGAL ANALYSIS

A nonconforming use or structure is a statutory creation. *N.J.S.A.* 40:55D–5 defines a "nonconforming use" as "... a use or activity which was lawful prior to adoption, revision or amendment of a zoning ordinance, but which fails to conform to the requirements of the zoning district in which it is located, by reasons of such adoption, revision or amendment." A "nonconforming structure" means "a structure the size, dimension or location of which was lawful prior to the adoption, revision or amendment of a zoning ordinance, but which fails to conform to the requirements

of the zoning district in which it is located by reasons of such adoption, revision or amendment."

The concept of the lawful or valid nonconforming use (or structure) was a direct result of the declaration of state constitutional powers to regulate land use made in *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 *U.S.* 365, 47 *S.Ct.* 114, 71 *L.Ed.* 303 (1926). In New Jersey, the constitutional amendment of 1927 (now Article IV, sec. VI par. 2 of the 1947 Constitution) expressly authorized the Legislature to enact laws granting zoning powers to municipalities. As a necessary corollary to constitutionality and to avoid the taking of property without due process, the prior existing non-conforming use concept was created along with the grant of variance powers to zoning boards of adjustment. *N.J.S.A.* 40:55D–68 (as did its predecessor), *R.S.* 40:55–48 provides:

> Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the structure so occupied ...

The statute then gives further protection to the nonconforming use (or structure) by providing "for the issuance of a certificate certifying that the use or structure existed before the adoption of the ordinance which rendered the use or structure nonconforming" upon the application of a "prospective purchaser, *prospective mortgagee* or any other person interested in the land upon which a nonconforming use or structure exists ..." (Emphasis added).

Since nonconforming uses or structures are at variance with the local Master Plan and Zoning Ordinance, they are not favored by the courts. There is an underlying assumption that, with the passage of time, they will become fewer and fewer in number. To ensure that result, the law is, generally, that neither nonconforming uses or structures may be expanded or changed in other than unsubstantial ways. If a use is "abandoned" or "terminated", it is no more. If a structure is completely demolished or destroyed, it may not be rebuilt. Modifications of either must be by permission of the Zoning Board of Adjustment or of the

Planning Board. *See,* Cox, *New Jersey Zoning and Land Use Administration* Chapter 11 at 189–212 (1995).

The concept of abandonment of a nonconforming use and the requisite findings to establish that conclusion, have been summarized and discussed in two recent Appellate Division opinions. *Villari v. Zoning Bd. of Adjustment,* 277 *N.J.Super.* 130, 649 *A.*2d 98 (App.Div.1994); *Poulathas v. Zoning Bd. of Adj.,* 282 *N.J.Super.* 310, 660 *A.*2d 7 (App.Div.1995). Each refer to *Belleville v. Parrillo's Inc.,* 83 *N.J.* 309, 416 *A.*2d 388 (1980) and *Camara v. Board of Adjustment,* 239 *N.J.Super.* 51, 570 *A.*2d 1012 (App.Div. 1990).

*Belleville v. Parrillo's Inc.* establishes the principle that abandonment of a valid nonconforming use can be a means of terminating that right. In that case, the owner changed what had been a nonconforming restaurant use into a discotheque or "dance hall" use. The Supreme Court found that change was substantial (and prohibited by the current zoning ordinance) and was therefore enjoinable. That case arose, however, from a municipal court complaint against Parillo's based on a violation of the zoning ordinance. A conviction was entered locally and affirmed on appeal to the Superior Court. The Appellate Division reversed the conviction based on its view that the change in use was not "an extension or enlargement of the use." In disagreeing with that evaluation, the Supreme Court merely reinstated the convictions on the ordinance violation. We do not know whether Parillo's returned to the former nonconforming restaurant use (see *Poulathas v. Zoning Bd. of Adj.,* 282 *N.J.Super.* at 314, 660 *A.*2d 7) or whether it applied for and was granted, a variance for the discotheque operation.

The Parillo's opinion cites *Borough of Saddle River v. Bobinski,* 108 *N.J.Super.* 6, 259 *A.*2d 727 (Ch.Div.1969) in support of the abandonment approach to elimination of nonconforming uses. In *Bobinski,* the borough claimed that the owners of a barn designed for the stabling of horses had lost the benefit of that nonconforming use by not stabling horses from 1940 through 1967. The barn

had been kept in good condition through those years and had not been used for any other purpose. the court held that the passage of the ordinance in 1963 (at a time when the barn was not actually being used to stable horses and which ordinance did not permit such use) did not preclude the stabling of horses in 1967. It considered the stabling use to have been in a state of "suspension" from 1940 forward, rather than having been abandoned. That court recognized that "actual abandonment of a nonconforming use is fatal to its continuance." *Id.* at 16, 259 *A.*2d 727. As to whether there has been an abandonment of a use or not the court held that "it must be again emphasized that the primary question is the intent of the owner as determined from his actions. Such intent must be determined on a case-by-case basis." *Id.* at 18, 259 *A.*2d 727. The court found no such intent in *Bobinski.*

In the course of his opinion in *Bobinski,* Judge Lora stated:

> It has frequently been stated that abandonment of a nonconforming use depends upon the concurrence of two factors; one, an intention to abandon; and two, some overt act, or some failure to act, which carries a sufficient implication that the owner neither claims nor retains any interest in the subject matter of abandonment.
>
> [citing 2 Yokley, *Zoning Law Practice* (3rd ed.1965) s. 16–13 at 273–274, as authority]. *Id.* at 16, 259 *A.*2d 727.

When one reads that statement it is quite clear that both factors deal with intent. Perhaps they are better stated as expressed intent (a matter of credibility) or inferred intent (based on circumstantial evidence). The aphorism "Actions speak louder than words," applies.

In any event, that quote from Yokley was adopted by the majority opinion in *Camara,* 239 *N.J.Super.* at 56, 570 *A.*2d 1012 and given arguable appellate validity. *Camara,* as authority, suffers from a very strong dissent and the fact that neither party pursued its appeal of right.

*Villari v. Zoning Bd. of Adjustment* is noteworthy for distinguishing what it termed "the traditional subjective test" of abandonment (the Yokley approach) from the "objective discontinuance

test" attributable to Professor Williams.[3] It relied upon by the majority opinion in *Camara*. *Villari*, 277 *N.J.Super.* at 136, 649 *A.*2d 98. The court in *Villari* determined that, under either test, abandonment had been demonstrated based on the evidence.

The test for abandonment had thus become rather confusing. That confusion has been put to rest by the terse statement of the law in *Poulathas, supra,* 282 *N.J.Super.* at 313, 660 *A.*2d 7:

> Abandonment is a matter of intent. *See,* Cox, *New Jersey Zoning and Land Use Administration* s. 11–5, 186 (1994); Cunningham, *Control of Land Use in New Jersey,* 14 *Rutgers L.Rev.* 37, 70 (1959). Intent is an issue of fact.

 That is the test this court used in finding abandonment of the nonconforming use. Abandonment of a nonconforming use arises from an intentional act or failure to act on the part of the owner. The intent must be proved to the satisfaction of the trier of fact and by a preponderance of the evidence from all of the circumstances presented in the evidence.

From the standpoint of property law, how does one describe a valid nonconforming use? It is certainly considered to be a valuable property right. It is incorporeal in nature but passes with a deed passing title to the fee. A prudent purchaser would ensure that the contract make provision for such language in the deed and also obtain, prior to closing title, the statutory certification. Similar prudence is required of a prospective mortgagee both in its commitment letter and by insisting on the statutory certificate.

 The nonconforming use is in the nature of an appurtenance [4] to the property or a profit [5] of the property. Therefore,

---

[3] 4A Norman Williams, *American Land Planning* s. 115.02, 115.03 at 187, 189 (1986 rev.).

[4] Appurtenance. That which belongs to something else; an adjunct; and appendage; something annexed to another thing. More worthy as principal and which passes as incident to it. . . . *Black's Law Dictionary* 133 (4th ed.).

[5] Profit. The benefit, advantage or pecuniary gain accruing to the owner or occupant of land from its actual use. . . . *Id.* at 1376.

whether the instrument involved is a deed or mortgage, the nonconforming use will pass with the property description if the "catch-all" language (rarely used today) "together with all and singular the buildings, improvements, ways, trees, waters, water courses, rights, liberties, privilege, tenements, hereditaments and appurtenances thereto belonging or in any wise appertaining." 29 *New Jersey Practice, Law of Mortgages* sec. 52, at 193 (Cunningham & Tischler) (1975).

The Lot 1 mortgage presently held by Washington Financial Corp. has no language of that nature. The Lot 2 mortgage held by National Investors does include as the "property mortgaged to the lender," subparagraph (e), "all other rights that I have, or will have, as owner of the property." That language would cause the nonconforming use status to be included in the lien of that mortgage.

A nonconforming use is an interest in the real property but under the law, one terminable by action or inaction of the owner. He may, in the course of obtaining a variance for a different purpose, stipulate the termination of his prior nonconforming use. He may also lose the nonconforming by abandonment. That process is analogous to the loss of a property interest by the unchallenged adverse activity of another for the requisite period of time.[6]

A mortgagee taking a mortgage on the property as security for the loan must protect itself against such action or inaction of the owner-mortgagor. It can provide as an event of default under the terms of note and mortgage, that upon mortgagor's failure to continue the particular nonconforming use, the mortgagee has that right to take possession in order to prevent loss of this use. Such

---

[6] Abandonment. 1(d): relinquishment by nonuser for a specified period (as of an easement). *Webster's Third New International Dictionary* 2 (1966).

Abandon. (1) to cease to assert or exercise an interest, right or title to: yield, relinquish (2) to surrender one's claim or right to; give up. *American Heritage Dictionary of the English Language* (1970).

provision is routinely made with regard to commission of waste or failure to maintain the property.

Without providing for such eventualities, the mortgagee is at the mercy of the owner, since it leaves use of the property under his sole control.

■ Here Morsemere Federal Savings Bank never acquired an interest in the nonconforming use status of Lot 1. There was nothing for Washington Financial Corp. to take in that regard by assignment. Morsemere Federal Savings Bank did obtain a security interest in the nonconforming status of Lot 2. However, it was lost by the owner's abandonment of that interest. Neither Morsemere or any of the subsequent assignees, including National Loan Investors, took any steps to prevent it. Both mortgagees reacted only to the Tax Certificate foreclosure and the deed of February 23, 1997 to the borough. By then, nonconforming use status has terminated by the abandonment by Hargadon as owner-mortgagor.

Judgment will be entered in favor of plaintiff declaring that when the properties are sold by the Sheriff they do not have the benefit of a valid nonconforming rooming house use.

The structures, of course, remain on the properties as valid nonconforming structures.